## BOBBY CHEEKS ET AL. *v.* THE CEDLAIR CORPORATION ET AL.

[No. 114, September Term, 1979.]

*Decided June 3, 1980.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE and DAVIDSON, JJ., and JAMES F. COUCH, JR., Associate Judge of the Court of Special Appeals, specially assigned.

*Lawrence B. Coshnear* and *Harold Buchman,* with whom were *Jane Pilliod* and *Phillip G. Dantes* on the brief, for appellants.

*Amicus curiae* brief filed by Richard L. Andrews, pro se.

*Eugene P. Smith* and *Judith D. O'Neill,* with whom were *Stuart R. Wilcox* and *Dana N. Pescosolido* on the brief, for The Cedlair Corp. and William & Lucia Goodhart, part of appellees. *Ira C. Cooke,* with whom were *M. Albert Figinski* and *Melnicove, Kaufman & Weiner, P.A.* on the brief, for appellee M. Albert Figinski. Submitted on brief by *Stephen*

H. Sachs, *Attorney General*, Mary N. Humphries and *Diana G. Motz, Assistant Attorneys General,* for Board of Supervisors of Elections of Baltimore City, other appellee.

MURPHY, C. J., delivered the opinion of the Court. COLE, J., dissents and filed a dissenting opinion at page 632 *infra.*

This appeal draws into question the legality under Article XI-A of the Constitution of Maryland of a citizen-initiated proposal to amend the Charter of Baltimore City (1964 revision). The proposed amendment (the amendment) would add a new article to the charter by establishing a comprehensive system of rent control for the City's residential housing market under the control of a new City agency to be known as the Tenant-Landlord Commission. The primary issues for determination are:

(a) Whether Article XI-A, §§ 1, 5 and 6 grant to the voters of Baltimore City the power to enact a system of rent control through initiation of a charter amendment;

(b) Whether the proposed amendment enlarges or extends the express powers granted to Baltimore City by the General Assembly, and thereby violates § 2 of Article XI-A;

(c) Whether the proposed amendment vests the primary lawmaking power in the field of rent control in a body other than the Baltimore City Council in violation of § 3 of Article XI-A.

(1)

Ratified by the voters in 1915, Art. XI-A, popularly known as the Home Rule Amendment, provides for the distribution of powers between the State Legislature and the political subdivisions of the State; the underlying purpose of the Article is to share with the counties and Baltimore City, within well-defined limits, powers formerly reserved to the General Assembly so as to afford the subdivisions certain powers of self-government. *Ritchmount Partnership v. Board,* 283 Md. 48, 388 A.2d 523 (1978); *City of Baltimore v. Sitnick & Firey,* 254 Md. 303, 255 A.2d 376 (1969); *Mont.*

*Citizens League v. Greenhalgh,* 253 Md. 151, 252 A.2d 242 (1969).

Section 1 of Art. XI-A provides for the election of a charter board in Baltimore City or any county to prepare "a charter or form of government," which, if adopted by the voters, "shall become the law of said City or County, subject only to the Constitution and Public General Laws of this State." Section 2 of Art. XI-A requires the adoption by the General Assembly of "a grant of express powers" for those counties adopting a charter and provides that the express powers so granted to the counties and "the powers heretofore granted to the City of Baltimore, as set forth in Article 4, Section 6, Public Local Laws of Maryland, shall not be enlarged or extended by any charter formed under the provisions of this Article, but such powers may be extended, modified, amended or repealed by the General Assembly."

Section 3 of Art. XI-A provides that any charter adopted under § 1 of Art. XI-A "shall provide for an elective legislative body in which shall be vested the law-making power of said City or County." This section further provides that, in the City of Baltimore, the lawmaking power shall be vested in the City Council of the City of Baltimore, and that after the adoption of a charter by the City, the Mayor of Baltimore and the Baltimore City Council

> "subject to the Constitution and Public General Laws of this State, shall have full power to enact local laws ... including the power to repeal or amend local laws of said City ... enacted by the General Assembly, upon all matters covered by the express powers granted as above provided."

Section 4 of Art. XI-A provides that after the adoption of a charter by the City or any county "no public local law shall be enacted by the General Assembly for said City or County on any subject covered by the express powers granted as above provided." Section 5 sets forth the procedure for proposing amendments to a charter; it authorizes charter amendment proposals by resolution of the Mayor of Baltimore and the City Council, or by a petition executed by

a specified number of registered voters. This section provides that the proposed amendment, if adopted by the voters, shall "become a part of the charter of said City or County." [1] Section 6 of Art. XI-A provides, in part:

> "[T]he power to make changes in Sections 1 to 6 inclusive, Article XI of this Constitution [entitled 'City of Baltimore'], when expressly granted as hereinbefore provided, are hereby transferred to the voters ... of [the] City of Baltimore ... provided that said powers so transferred shall be exercised only by the adoption or amendment of a charter as hereinbefore provided; and provided further that this Article shall not be construed to authorize the exercise of any powers in excess of those conferred by the Legislature upon said ... City as this Article sets forth."

In pursuance of the provisions of Art. XI-A, the voters of Baltimore City adopted a charter in 1918. It superseded the City's earlier legislative charter, enacted by ch. 123 of the Acts of 1898. The 1918 charter, like the 1898 charter, declared that the "inhabitants of the City of Baltimore are a corporation by the name of the 'Mayor and City Council of Baltimore.'"

---

1. Section 5 of Art. XI-A provides:

"Amendments to any charter adopted by the City of Baltimore or by any County of this State under the provisions of this Article may be proposed by a resolution of the Mayor of Baltimore and the City Council of said the City of Baltimore, or the Council of said County, or by a petition signed by not less than 20% of the registered voters of said City or County, provided, however, that in any case 10,000 signatures shall be sufficient to complete a petition, and filed with the Mayor of Baltimore or the President of the County Council, and when so proposed shall be submitted to the voters of said City or County at the next general or congressional election occurring after the passage of said resolution, or the filing of said petition; and if at said election the majority of the votes cast for and against said amendment shall be in favor thereof, said amendment shall be adopted and become a part of the charter of said City or County from and after the thirtieth day after said election. Said amendments shall be published by said Mayor of Baltimore or President of the County Council once a week for five successive weeks prior to said election in at least one newspaper published in said City or County."

The express powers granted to the City in the 1898 charter were codified as Art. 4, § 6 of the Public Local Laws of Maryland, and it was these powers which constituted the grant of express charter powers to the City under § 2 of Art. XI-A.[2] The grant vested "full power and authority" in the Mayor and City Council of Baltimore (the City) to "pass ordinances . . . [exercising] within the limits of the City of Baltimore all the power commonly known as the Police Power to the same extent as the State has or could exercise said power within said limits." Also granted to the City was "full power and authority" to pass ordinances deemed expedient "in maintaining the peace, good government, health and welfare of the City of Baltimore."

By chapter 555 of the Acts of 1920, the Legislature expressly granted to the voters of the City, as authorized by § 6 of Art. XI-A, the power, by charter amendment, "to make such changes in Sections 1 to 6, inclusive, of Article XI of the Constitution . . ., as they may deem best." The Act provided "that nothing in this section contained shall be construed to authorize the exercise of any powers in excess of those conferred by the Legislature upon said City . . . as set forth in Article XI-A of said Constitution."[3]

Chapter 555 of the Acts of 1920 also provided:

"[N]othing contained in this Act shall give to the Mayor and City Council of Baltimore or to the inhabitants thereof the right to initiate any legislation, laws, or ordinances relating to the

---

**2.** By chapter 456 of the Acts of 1918, now codified as Maryland Code (1957, 1973 Repl. Vol.) Art. 25A, § 5, the Legislature enacted the Express Powers Act, granting powers to those counties adopting a charter under Art. XI-A.

**3.** Section 1 of Art. XI relates to the Mayor's election, qualifications, compensation, powers, duties, and term of office. Section 2 relates to the composition of the City Council, the qualifications of the members, their compensation, term of office, powers and duties. Section 3 relates to the election of members of the City Council. Section 4 relates to sessions of the City Council. Section 5 relates to the holding of additional offices or employments by the Mayor and City Council members and prohibits their interest in certain contracts. Section 6 relates to the removal of the Mayor from office.

classification and taxation of real and personal property within the limits of the said City . . . ."

By § 3 of ch. 555, it was provided that "nothing herein shall be construed to take away or limit any power which is now vested in the Mayor and City Council of Baltimore, under the laws as existed prior to the passage of this Act." [4]

The General Assembly, by chapter 548 of the Acts of 1945, amended the grant of express powers to the City set forth in Article 4, § 6 of the Public Local Laws of Maryland. The amendment provided, among other things, that the "full power and authority" vested in the City to exercise the express powers granted to it is "power by ordinance, or such other method as may be provided for in its Charter."

The present City Charter provides in Article III, § 15 that "Every legislative act of the City shall be by ordinance or resolution."

(2)

The proposed charter amendment here involved was initiated by a number of individuals and organizations who were dissatisfied with the refusal of the Baltimore City Council to enact continuing rent control legislation.[5] The amendment proposes that new Article 6A, entitled "Tenant-Landlord Relations," be added to the Baltimore City Charter, and it recites, in a "Statement of Purpose" provision, that:

"The prevailing conditions in the Baltimore City residential rental housing market, including low vacancy rates in standard rental housing, speculation, rapidly increasing rents and a large number of substandard rental units, adversely affect the health and welfare and safety of a substantial portion of Baltimore City residents. The

---

**4.** The power granted to the voters by ch. 555 is set forth in the present City Charter in Article II (49).

**5.** Rent control was in effect in Baltimore City by ordinance of the City Council from July 1, 1975 to June 30, 1976.

purpose of this Article is to alleviate the hardship caused by this serious housing problem."

The amendment creates a five-member Tenant-Landlord Commission to be appointed by the City Council. It prescribes, in lengthy detail, the powers and duties of the Commission in administering the system of rent control. The amendment calls for the imposition by the Commission of an annual rental unit registration fee to be paid by landlords to defray the cost of operating the system. It requires that landlords file a "registration statement" with the Commission for each rental unit owned and provide designated information pertaining to the rent to be charged, together with a list of violations outstanding against the property. The amendment contains provisions authorizing the Commission to restrict the removal of certain rental units from the rental market. It sets forth a detailed system whereby the Commission may limit rent increases above an established base ceiling level. It empowers the Commission to fix allowable "annual percentage basic rental increases" after considering fluctuations in landlord expenditures. The amendment contains provisions for extraordinary rent increases in hardship cases, as well as for reductions in rents in certain circumstances. It establishes procedures to which the Commission must adhere in exercising its deliberative functions, and it imposes a comprehensive system of monetary penalties for violation of provisions of the amendment, and for failure to comply with Commission rules and decisions.[6]

Purporting to act under § 5 of Art. XI-A of the Maryland Constitution, proponents of the amendment completed a petition to submit the amendment to a vote of the City electorate at the municipal election scheduled for November 6, 1979. On September 14, 1979, opponents of the amendment filed a suit in the Circuit Court of Baltimore City to enjoin election officials from placing the amendment on the ballot and, additionally, to have it declared invalid on the ground, among others, that it violated Art. XI-A of the

6. The amendment is printed in full as Appendix A to this opinion.

Maryland Constitution in a number of particulars. It was first contended that the amendment was not a charter amendment at all but rather mere local legislation and, as such, beyond the scope of the charter initiative power granted by § 5 of Art. XI-A. This argument was bottomed on the premise that a charter sets forth only the form and structure of government and, because the proposed amendment was not so limited, but instead dictates the individual rights and responsibilities of landlords and tenants, the amendment's content was not "charter material." It was contended that while § 5 permits amendments to charters, it does not permit mere legislation to be added to charters.

The opponents of the amendment also contended that the amendment divested the City Council of its constitutionally vested legislative powers in violation of the provisions of § 3 of Art. XI-A, which mandate that the charter "provide for an elective legislative body in which shall be vested the law-making powers of said City." It was urged that under § 3 the City Council is vested with full power and authority to legislate upon all matters covered by the express powers granted to the City. Among those powers, the opponents maintained, was the police power and the general welfare power, either of which vested in the City Council the exclusive power to legislate on the subject of rent control. Consequently, it was urged, no power is vested in the voters of the City, by charter amendment, either to enact a system of rent control or to strip the City Council of its acknowledged power to legislate in this field. It was contended that the voters of the City are not empowered by Art. XI-A of the Constitution to exercise any of the City's express powers by or through a charter amendment. Because the proposed amendment was an attempt to exercise the City's police power, it constituted, the opponents claimed, an invalid enlargement and extension of the express powers granted to the City in violation of §§ 2 and 6 of Art. XI-A. This was alleged to be so because under § 3 of Art. XI-A the grant of express power to legislate was vested in the City

Council, and was limited to the enactment of laws by ordinance, and not by charter amendment.

The court (Kaplan, J.), adopting arguments advanced by opponents of the amendment (hereinafter the appellees), declared that the amendment was invalid because it constituted "legislation" beyond the power of the electorate to initiate under Article XI-A. The court said that "[w]hat has taken place is an exercise of the police power by plebiscite . . . [which is] legally impermissible." [7] Proponents of the amendment who had intervened in the proceedings before the lower court (hereinafter the appellants) appealed to the Court of Special Appeals. We granted certiorari prior to decision by that court to consider the important issues raised in the case.

(3)

Appellants contend that the provisions of §§ 1, 5 and 6 of Art. XI-A fully support the legality of the amendment. They argue, notwithstanding §§ 2 and 3 of Article XI-A, that § 6 of that Article is the key to understanding the ultimate source of political power in Baltimore City. That section, as heretofore indicated, provides that the General Assembly could — as it did by ch. 555 of the Acts of 1920 — transfer power to the voters of the City to make changes, by charter amendment, in §§ 1 to 6, inclusive, of Art. XI of the Constitution. Appellants contend that the specific provision in Article XI "changed" by the proposed amendment is found in § 2 of that Article, which states:

"The City Council of Baltimore shall consist of Two Branches, one of which shall be called the First

---

7. The court found the proposed amendment invalid on other grounds as well. It held that the provision of the amendment pertaining to the removal of rental units from the rental housing market was in conflict with a Public General Law governing the establishment of condominium regimes (Maryland Code (1974) § 11-102 of the Real Property Article). This provision was deemed by the court not to be severable from the remainder of the amendment. The court also declared the amendment invalid on the ground that it did not contain sufficient guidelines for action by the Tenant-Landlord Commission. It held that the amendment violated the due process clauses of the state and federal constitutions and unconstitutionally vested judicial authority in the Commission.

Branch, and the other the Second Branch; and each shall consist of such number of members, having such qualification, receiving such compensation, *performing such duties, possessing such powers,* holding such terms of office, and elected in such manner, as are now, or may hereafter be prescribed by Law." (Emphasis added.)

Appellants interpret Art. XI-A, § 6 as granting to the voters of Baltimore City the right to amend the City Charter and transfer the power to establish a system of rent control from the City Council to the Tenant-Landlord Commission.

Appellants also contend that Art. XI-A, § 1 is an additional source of the voters' right to allocate power among various governmental bodies in the City. Relying on *Ritchmount Partnership v. Board,* 283 Md. 48, 388 A.2d 523 (1978), they contend that § 1 of Article XI-A reserves to the voters of Baltimore the right to institute self-government through adoption of a charter. Appellants claim that *Ritchmount* recognizes the charter as the mechanism for allocating power among governmental agencies and, accordingly, the voters of the City may, under § 5 of Art. XI-A, amend the charter by divesting the City Council of its power over rent control and transferring it to the Tenant-Landlord Commission. The right to amend the charter, appellants conclude, may be so exercised by the voters as long as the proposed amendment does not (1) violate the state or federal constitutions, (2) violate or conflict with a Public General Law, or (3) exceed the express powers granted to the City by the General Assembly.

Appellants contend that the lower court erred in striking down the amendment on the ground that it constituted mere legislation — an exercise of the police power by plebiscite. Relying on *Ritchmount Partnership,* the appellants argue that the voters of the City have a right to "legislate" by charter amendment. They assert that while Baltimore City may exercise only those powers granted by the General Assembly, nothing in §§ 2, 3 or 6 of Art. XI-A prohibits the voters of the City from exercising the police power by charter

amendment under § 5. The appellants contend that the proposed amendment does not enlarge the express powers granted to the City by § 2 of Art. XI-A, and that the General Assembly did not limit the exercise of the police and general welfare powers to ordinances enacted by the City Council. Accordingly, the appellants claim that a charter amendment may be based upon any express power granted to the City under § 2 of Art. XI-A.

Appellants contend that a narrow reading of §§ 2 and 3 of Art. XI-A would "emasculate" § 6, and run afoul of *Ritchmount,* which recognizes the right of the voters to amend the charter by allocating power among the agencies of local government, and to reserve to themselves the powers of referendum and initiative. To buttress this contention, the appellants rely on ch. 555 of the Acts of 1920, granting power to the voters of Baltimore City to make changes by charter amendment in §§ 1-6, inclusive of Art. XI of the Constitution, wherein the Legislature expressly prohibited the City or its inhabitants from exercising "the right to initiate any legislation, laws or ordinances relating to the classification and taxation of real and personal property within the limits of the said City . . . ." Appellants argue that by necessary implication the General Assembly assumed that under Art. XI-A, § 6, the voters of the City would have the right to initiate any legislation, laws or ordinances; otherwise, there would have been no need for a specific prohibition for the classification and taxation of real and personal property.

(4)

"[A] charter or form of government" (the terms being equivalent), which the voters of Baltimore City or any county may adopt under Art. XI-A, § 1, is, in effect, a local constitution which forms the framework for the organization of the local government; it is "the instrument which establishes the agencies of local government and provides for the allocation of powers among them." *Ritchmount*

*Partnership v. Board, supra,* 283 Md. at 58. A charter, in essence

> "creates the body politic and corporate, contains the municipal powers and gives the form of municipal organization, locates the corporate boundaries and wards or other subdivisions, classifies and distributes the powers and duties of the various departments, boards and officers, and provides the manner in which the several powers shall be exercised." 2 E. McQuillan, *Municipal Corporations* § 9.03 (3rd ed. 1979).

A charter is thus a permanent document intended to provide a broad organizational framework establishing the form and structure of government in pursuance of which the political subdivision is to be governed and local laws enacted. It is the organic, the fundamental law, establishing basic principles governing relationships between the government and the people, and among the various governmental branches and bodies. Indeed, the Charter of Baltimore City is a textbook example of the traditional charter form of government. Divided into nine compact Articles, the City Charter sets forth "General Provisions" in Article I. Article II contains the "General Powers" expressly delegated to the City. Articles III through VI relate to the composition, powers and duties, respectively, of the City Council, the Mayor, the Comptroller, and the Board of Estimates. Article VII provides for executive departments, and Article VIII defines the rights and powers of the City with respect to franchises. Article IX contains "Transitional Provisions."

Absent an intention to permit a contrary usage, a charter amendment within the context of Art. XI-A is necessarily limited in substance to amending the form or structure of government initially established by adoption of the charter. A charter amendment, therefore, differs in its fundamental character from a simple legislative enactment. Its content cannot transcend its limited office and be made to serve or function as a vehicle through which to adopt local legislation. *See Astwood v. Cohen,* 291 N.Y. 484, 53 N.E.2d

358 (1944), involving a proposed amendment to the New York City Charter to provide bonuses to policemen and firefighters, where the Court of Appeals of New York held that only amendments to the New York City Charter, and not local laws, may be enacted by the process of charter initiative.

The charter amendment proposed in this case was intended, not simply to create a new City agency with authority over matters pertaining to landlords and tenants, but rather to establish a comprehensive system for regulating rents within the City's residential housing market. At the core of the amendment is the imposition of ceilings on rents — a form of price control — which, as appellants readily concede, constitutes an exercise of the police power in all respects similar to the enactment of a local law. *See Westchester West No. 2 v. Mont. Co.,* 276 Md. 448, 348 A.2d 856 (1975). Whether the voters of Baltimore City, by charter amendment, are empowered to include such a measure in the City Charter necessarily depends upon the meaning of the provisions of Art. XI-A considered in their entirety.

We think it clear that the amendment is essentially legislative in character. Considered as a whole, the amendment is not addressed to the form or structure of government in any fundamental sense and is not, therefore, "charter material," as the lower court so succinctly stated. Unless §§ 1, 5 or 6 of Art. XI-A, either explicitly or implicitly, otherwise permit the voters to "legislate" by charter amendment, notwithstanding §§ 2 and 3 of Art. XI-A, and to thereby directly exercise the City's police or general welfare powers, the amendment is invalid for insufficiency of subject matter in the sense that it is not a charter amendment within the contemplation of § 5.

As previously indicated, § 3 of Art. XI-A requires that the City Charter provide for an elected City Council in which is vested the City's "law-making power." Under § 3, the City Council, and not the City electorate, is specifically given "full power" to enact local laws upon "all matters covered by

the express powers granted" by § 2 — powers which under that section may not be "enlarged or extended" by charter provision. The power of the City voters under § 6 and its implementing legislation to change the powers of the City Council by charter amendment is restricted by the provision contained in § 6 that such authority may not be exercised in violation of other powers vested in the City under Art. XI-A. The voters' power under § 6 is further restricted by ch. 555 of the Acts of 1920, as amended by ch. 548 of the Acts of 1945, which together provide that the voters' powers under § 6 cannot be exercised to take away or limit any power vested in the City under any law existing prior to June 1, 1945. Section 6 cannot, therefore, limit the City Council's powers under § 3 or operate to extend or enlarge the express powers granted under § 2. Consequently, the proposed amendment cannot, by reason of § 6, divest the Council of its acknowledged police power to legislate on the subject of rent control. *See Heubeck v. City of Baltimore,* 205 Md. 203, 107 A.2d 99 (1954). That this is the intended effect of the amendment is conceded by the appellants. Indeed, they readily admit that the amendment represents a direct exercise by the voters of the City's police power by charter initiative, through which they have attempted to create a nonelective Tenant-Landlord Commission vested with broad legislative authority to fix and maintain rental rates for the City's residential housing market.

Under § 2 of Article XI-A, only the General Assembly can alter the express powers granted to the City. *Armco v. Dept. of Assess. & Tax.,* 236 Md. 168, 202 A.2d 741 (1964); *Kimball-Tyler v. Balto. City,* 214 Md. 86, 133 A.2d 433 (1957). To permit the voters, by charter amendment, to exercise the City's police or general welfare powers would constitute an unlawful extension or enlargement of the City's limited grant of express powers and would violate the constitutional requirement that those powers be exercised by ordinance enacted by the City Council.[8] In other words,

---

8. Although the City is authorized under its grant of express powers to adopt, in its charter, a method for exercising the express powers other than by ordinance, it has not done so.

to allow the voters, through the charter initiative, rather than the legislative process, to exercise the full range of the City's express powers would plainly involve an excessive exercise of those precisely limited powers granted to the City, and specifically to the City Council in its representative capacity. We therefore conclude that the amendment is in derogation of §§ 2, 3, 5 and 6 of Art. XI-A and hence is invalid unless the provisions of § 1 of that Article, as interpreted most recently in *Ritchmount Partnership,* otherwise legitimate the voters' powers through charter initiative to enact a comprehensive system of rent control.

*Ritchmount Partnership,* upon which appellants place heavy reliance, involved Art. III, § 308 of the home rule charter of Anne Arundel County, which reserved to the people "the power known as 'The Referendum', by petition to have submitted to the registered voters of the County, to approve or reject at the polls, any ordinance . . . of the County Council." The question in that case was whether, under Art. XI-A, the people of a chartered county could constitutionally confer upon themselves the power of referendum over local legislative enactments, where such power was neither delegated by act of the General Assembly, nor expressly reserved to the inhabitants of charter counties by the Maryland Constitution. It was argued that § 308 of the charter was invalid as an exercise of power in excess of that vested in counties adopting a charter form of government under Art. XI-A, as implemented by the Express Powers Act, Maryland Code, Art. 25A.

We observed that the power of referendum by petition is "a power affecting the form or structure of local government and therefore belongs to that class of powers vested directly in the people of the several counties by Article XI-A, § 1." 283 Md. at 61. We reasoned that the power to establish and organize local government springs directly from Art. XI-A; that certain powers are there implicit and do not require implementing legislation to render them operative; and that these powers "necessarily proceed from § 1 of the Home Rule

Amendment and have as their object the initial organization and formation of charter government." *Id.* at 58.

We said in *Ritchmount Partnership* that the people, in adopting a home rule charter, "have the right to make provision therein for any form of government they deem suitable for their needs, so long as they do not in the process run afoul of the letter and spirit of the Federal and State Constitutions"; and that the right of the people "to adopt a particular form of government, in contradistinction to the power to enact local legislation, is in no way dependent on legislative authorization or enactment." *Id.* at 59. We held that § 1 of Art. XI-A thus conferred upon the citizens of Anne Arundel County the right to reserve unto themselves by express charter provision the power to refer legislation enacted by the Anne Arundel County Council. In so concluding, we recognized that the referendum power was one "of direct legislation through the exercise of which the people of a state or political subdivision may approve or reject an act or other measure passed by a legislative body." *Id.* at 60. It was in this context that we noted that the referendum is an integral component of the legislative process and that it establishes, in effect, a "coordinate legislative entity," *i.e.,* the county electorate. We rejected the argument that the power by referendum to repeal or amend local legislation by plebiscite violates § 3 of Art. XI-A, which requires that the County Council shall have "full power" to enact local laws. We found that the effect of § 308 of the Anne Arundel County Charter, in placing a portion of the lawmaking power in the people, was not in derogation of the plenary powers of the County Council. We observed that § 3 of Art. XI-A did not confine "the power to legislate exclusively to the council," nor did it "prohibit the exercise of some portion of this power by the people." *Id.* at 62. We said that the provision in § 3 that the charter " 'shall provide for an elective legislative body in which shall be vested the [county's] law-making power' " rendered the council "the ultimate repository of all legislative power possessed by the county and not expressly reserved to some other body, such as the electorate." *Id.* at 62-63. Section 3

undoubtedly requires, we said, that the council be "the primary legislative organ" but that did not "preclude the existence of other entities with coordinate legislative powers." *Id.* at 63. The declaration in § 3 that the council has "full power" to enact local laws did not, we held, "imply exclusivity," but referred only to "the *quality* of the legislative power vested in the council and granted by the General Assembly." *Id.* at 63.

*Ritchmount Partnership* thus holds that the referendum power is a power affecting the form or structure of local government, as distinguished from the power to enact local laws which must emanate from an express grant of legislative powers by the General Assembly. Consequently, the referendum power was implicitly reserved to the people under § 1 of Art. XI-A and could be incorporated into a home rule charter without an express grant of legislative power, provided that it did not violate any other provision of the Home Rule Amendment. No such incompatibility was found to exist between the power of referendum by petition and the provisions of § 3 of Art. XI-A requiring that the lawmaking power of the county be vested in an elective legislative body having full power to enact local laws upon all matters covered by the express powers granted. Because the referendum power is a power exercised by the voters after a law has been enacted, rather than a power to enact the law itself, we found that the referendum power was not constitutionally inconsistent with the primacy of the County Council as the elected lawmaking body under § 3. Notwithstanding the impact of the referendum on the legislative process, the provisions of § 3 were not violated since the County Council remained as the primary legislative organ of the county, *i.e.,* as the ultimate repository of all legislative powers possessed by the county and not expressly reserved to the electorate.

*Ritchmount Partnership* did not involve, as here, a claim of conflict with the provisions of §§ 2 and 6 of Art. XI-A or with the legality of a charter amendment under § 5. Nothing in that case is even remotely at odds with our conclusion that the amendment violates § 2, is not

authorized by § 6, and does not qualify as a charter amendment under § 5. Moreover, we think the amendment, being legislative in character, violates § 3 as well, notwithstanding our earlier holding that the exercise of the referendum power by the people is not in conflict with the requirements of that section. The powers of referendum and initiative, though each may affect the form or structure of local government, are otherwise distinctly different. Under the referendum power, the elective legislative body, consistent with § 3, continues to be the primary legislative organ, for it has formulated and approved the legislative enactment referred to the people. The exercise of the legislative initiative power, however, completely circumvents the legislative body, thereby totally undermining its status as the primary legislative organ.[9] Thus, the power to initiate legislation, unlike the referendum power, cannot be reconciled with § 3, and consequently a charter amendment which, as here, concededly constitutes an exercise of the police power — an attempt to legislate by charter initiative — runs afoul of the dictates of § 3.

It is clear from *Ritchmount Partnership* that certain powers may be considered impliedly conferred under Art. XI-A, § 1, and do not require implementing legislation to permit their invocation. Such reserved powers, however, can only be exercised if they are incorporated into the charter by express charter provisions. The only charter provision relied on by the appellants is Article II (49) (which embodies the express grant of power from § 1 of ch. 555 of the Acts of 1920). This provision provides in pertinent part that "nothing herein contained shall give to the City or to the inhabitants thereof the right to initiate any legislation, laws or ordinances relating to the classification and taxation of real and personal property within the limits of said city." Contrary to the appellants' contention that this provision is the source of a broad initiative power, this language does no more than express the intention of the Legislature to restrict

---

**9.** The legislative initiative empowers the people to propose laws and to enact or reject them at the polls. *See* Hughes v. Bryan, 425 P.2d 952 (Okla. 1967); Rea v. City of Reno, 76 Nev. 483, 357 P.2d 585 (1960).

to itself the power to enact laws concerning the classification and taxation of property. Indeed, the report of the Baltimore City Charter Board to the Mayor, dated May 4, 1918, stated that under Art. XI-A, the City was not empowered to adopt a charter which provided for the process of legislative initiative. This was so, undoubtedly, because of the perceived conflict between the initiation of local laws under the City's grant of express powers and the provisions of §§ 2 and 3 of Art. XI-A. The people's right of initiative was thus restricted to proposing charter amendments by petition, as expressly provided in § 5.

Accepting the principles of *Ritchmount Partnership* as applicable alike to chartered counties and to the Charter of Baltimore City, and considering them in light of the provisions of Art. XI-A, we hold that the amendment is invalid and of no effect.

(5)

It is suggested by amicus curiae that §§ 1 through 6 of the amendment, creating the Commission and arranging the structure, powers and duties of the new City agency, constitute charter material which is severable from the remainder of the amendment, *i.e.,* §§ 7 through 18 which establish a comprehensive regulatory scheme of rent control. Despite the existence of a severability clause in the amendment, the appellants, as well as the appellees, take the position that the amendment is not so severable but rather is an integrated whole. After careful consideration of the amendment's provisions, we agree with the parties and therefore find that no part of the amendment is severable. *See Wheeler v. State,* 281 Md. 593, 380 A.2d 1052 (1977), *cert. denied,* 435 U.S. 997, 98 S. Ct. 1650, 56 L. Ed. 2d 86 (1978); *Heubeck v. City of Baltimore,* 205 Md. 203, 107 A.2d 99 (1954).

In view of our disposition of the case, we need not consider other issues raised by the appellants and by the appellees in their cross-appeal.

> *Decree affirmed; costs to be paid by appellants.*

Appendix A

## PETITION FOR CHARTER AMENDMENT

At the municipal election to be held in Baltimore City on Tuesday, November 6, 1979, the following Petition for an amendment to the Charter of the Mayor and City Council of Baltimore (1964 Revision, as amended), pursuant to Section 5 of Article XI-A of the Constitution of Maryland, by adding a new Article 6A to the City Charter, will be submitted to the voters of Baltimore City for their approval or disapproval:

## ARTICLE 6A:

## TENANT-LANDLORD RELATIONS

### SECTION 1.  STATEMENT OF PURPOSE

The prevailing conditions in the Baltimore City residential rental housing market, including low vacancy rates in standard rental housing, speculation, rapidly increasing rents and a large number of substandard rental units, adversely affect the health and welfare and safety of a substantial portion of Baltimore City residents. The purpose of this Article is to alleviate the hardship caused by this serious housing problem.

### SECTION 2.  DEFINITIONS

(a) *Housing Services:* Includes all services, things, benefits, privileges, maintenance, or facilities provided to or connected with the use and occupancy of any rental unit, including a proportionate part of housing services provided to common facilities of a building in which a rental unit is contained.

(b) *Including:* Shall mean including but not limited to.

(c) *Landlord:* An owner, lessor, sublessor or any other person entitled to receive rent for the use and occupancy of any rental unit, or an agent, representative or successor of any of the foregoing.

(d) *Low to Moderate Income:* Income in the range that will qualify its recipient for admission to public housing which is owned and operated by the Housing Authority of Baltimore City.

(e) *Rent:* All periodic payments and all nonmonetary consideration, including the fair market value of goods or services rendered to or for the benefit of the landlord under an agreement concerning the use or occupancy of a rental unit and premises, including all payments and consideration demanded or paid for services, fees or privileges.

(f) *Rental Housing Agreement:* A lease or agreement, oral, written or implied, between a landlord and tenant for use or occupancy of a rental unit and for housing services.

(g) *Rental Unit:* Any building, structure, or property, or any part thereof individually leased, or land appurtenant thereto or any other rental property, real or personal, rented or offered for dwelling purposes, together with all services connected with the occupancy of such property and such common areas held out for use by the tenant, except:

(1) Rental units in hotels, motels, inns, tourist homes and rooming and boarding houses which are rented primarily to transient guests for a period of less than fourteen (14) days, and

(2) Rental units in any hospital, convent, monastery, extended medical care facility, asylum, non-profit home for the aged, or dormitory owned and operated by an institution of higher education, and

(3) Individual rental units which a government unit, agency, or authority owns, operates, or manages, or rental units for which tenant or landlord receives a governmental rent subsidy, only if rents are tied to a fixed percentage of the tenant's income. Such exemption shall apply only where an actual conflict between local law and Federal regulations is shown to exist by the landlord.

(4) Rental units in buildings of no more than

three units, one of which is occupied by the owner as his residence.

(5) Newly constructed rental units and dwellings first offered for rental on the rental housing market after the adoption of this Article or rental units which have been vacant for a period of at least one year, and which have been substantially rehabilitated. This exemption shall only apply to the initial written or oral rental housing agreement.

(h) *Standard Rental Housing:* Rental housing which is in substantial compliance with all applicable housing, health and safety laws.

(i) *Substantial Rehabilitation:* Capital improvements to a rental unit for which:

(1) a building permit was granted on or after November 1, 1978; and

(2) the total expenditure therefore equals at least fifty (50) per cent of the market value of the real property as determined by its current real property tax assessment, excluding land.

(j) *Tenant:* A tenant, subtenant, lessee, sublessee or any other person entitled by a rental housing agreement to the use or occupancy of any rental unit.

## SECTION 3. TENANT-LANDLORD COMMISSION

(a) *Composition:* There shall be in the City of Baltimore a Tenant-Landlord Commission ("the Commission") composed of five (5) resident, registered voters of Baltimore City appointed by the City Council. Two (2) members shall be landlords, one of whom shall be a landlord owning, managing or having interests in less than ten (10) rental units. Two (2) members shall be tenants and not own, manage or have interest in any rental property, one of whom shall be a low to moderate income person. One member shall be a home-owner and shall not own or have interest in any rental unit.

(b) All persons interested in being appointed as a Commissioner shall deliver, at least five (5) days before the public hearing, to the President of the City Council, a statement requesting appointment and which shall include all required information. All such statements shall be available for public inspection and copying.

(c) Within twenty (20) days of the effective date of this Article, the President of the City Council shall publish in two (2) daily newspapers for at least two (2) consecutive Sundays, a notice which shall set out the following:

(1) the requirements for eligibility to be appointed to the Commission; and

(2) a request for any candidate to submit a statement requesting appointment to include: their name and address, and information regarding all real property assets of the candidate and his immediate family; and

(3) the last day on which nominations will be accepted; and

(4) the date of the public hearing on appointments.

Within thirty (30) days of the effective date of this Article the public hearing shall be held, and appointments shall be made within forty-two (42) days of the effective date of this Article.

(d) *Term of Office:* Commissioners shall be appointed to a three (3) year term, with the exception of one landlord and one tenant representative who shall be initially appointed for a two (2) year term in order to stagger the appointment process. Commissioners shall serve a maximum of two (2) full terms.

(e) If any vacancy occurs on the Commission, other than by expiration of a term, the Commissioners shall appoint a replacement Commissioner for the balance of the term who meets the qualifications of the vacant position. If no replacement Commissioner is appointed within fifteen (15) days of the vacancy, then the City Council shall appoint a replacement Commissioner following the procedures above.

(f) *Compensation:* Commissioners shall receive compensation at the rate of twenty-five dollars ($25.00) for attendance at each regular meeting of the Commission when such Commissioner is engaged in the actual performance of duties vested in the Commission.

(g) *Quorum:* Three (3) members of the Commission shall constitute a quorum for the purposes of transacting business.

(h) The Commission shall choose annually, from among its members, a chairperson and any other officers as it deems necessary.

## SECTION 4.  DUTIES OF THE COMMISSION

(a) The Commission shall report annually to the City Council on trends in the rental housing market and the activities of the Commission.

(b) The Commission shall, by February 15, 1980, promulgate temporary rules and procedures for the administration of this Article. By July 1, 1980, the Commission shall, after holding at least one public hearing, promulgate permanent rules and procedures. Thereafter, the Commission shall promulgate, amend, and rescind rules and procedures. All such rules and procedures shall be consistent with and reasonably necessary for the administration of this Article.

(c) The Commission shall set with approval of the Board of Estimates, an annual rental unit registration fee to be paid by landlords. Such fee shall be set at a rate sufficient to substantially defray all anticipated necessary expenses for the administration of this Article.

(d) The Commission shall publish a brochure explaining the rights and obligations of tenants and landlords under this Article and maintain a telephone information service.

## SECTION 5.  POWERS OF THE COMMISSION

(a) The Commission shall have all powers reasonable and necessary for the efficient administration of this Article.

(b) The Commission shall have the power to hold hearings, and to subpoena witnesses, and the production of such books, records, papers and documents as are reasonable in carrying out its functions under this Article.

(c) The Chairperson of the Commission shall have the power to request of any Baltimore City governmental agency or entity, and such agency or entity is authorized to furnish any information or assistance which the Commission deems necessary to effectively carry out this Article.

(d) Within thirty (30) days of the appointment of the Commissioners, the Mayor and City Council and Board of Estimates shall appropriate such funds as are necessary and render any other necessary assistance to the Commission and Tenant Landlord Office for the efficient and timely administration of this Article through the end of the current fiscal year. Thereafter, the Commission shall annually submit a fiscal year budget to the Mayor and shall be included in the annual Ordinance of Estimates.

(e) The Commission shall appoint an Executive Director who shall be the chief administrative officer of the Tenant Landlord Office. The Executive Director shall hold such position at the pleasure of and shall act at the direction of the Commission. The Executive Director may employ, within the funds available, such personnel and consultants as are necessary to carry out the provisions of this Article.

(f) The Mayor and City Council may, by ordinance, expand the powers of the Commission.

## SECTION 6.  TENANT LANDLORD OFFICE

There is hereby created, as an agency of the City of Baltimore, a Tenant Landlord Office. The Mayor and City Council shall do all and any acts within their power, necessary and reasonable to provide for the needs of the Tenant Landlord Office.

## SECTION 7.  REGISTRATION OF RENTAL UNITS

(a) By May 1, 1980, and annually thereafter, each

landlord shall file a registration statement with the Commission for each rental unit for which he is receiving or is entitled to receive rent on a form to be provided by the Commission.

(b) For each rental unit, there shall be an annual registration fee to be paid at the time a landlord files the annual registration statement.

(c) The registration statement shall include: the name and address of the owner and management agent, if any; the current rent; the base rent ceiling for the rental unit; a list of any outstanding violations; and any other information deemed relevant.

## SECTION 8. REMOVAL OF CERTAIN RENTAL UNITS FROM THE RENTAL HOUSING MARKET

(a) To remove from the rental housing market by demolition or by conversion to another use, any property having four (4) or more rental units, the landlord shall request from the Commission a removal permit.

(b) Prior to rendering a decision on such a request, the Commission shall seek information from the interested parties on and shall consider and make findings on each item as follows:

(1) Whether the landlord can make a fair return on his investment by retaining the property as rental units; and

(2) Whether the rental units are habitable, or capable of being made habitable in an economically feasible manner; and

(3) Whether the rental units are occupied by or affordable to persons of low to moderate income; and

(4) Whether a majority of current tenants, if any, approve or disapprove of the granting of the permit.

(c) If the Commission makes a negative finding on (b)(1) or (b)(2) the permit shall be summarily granted.

(d) Subsection (b) shall not apply where the permit is sought pursuant to a governmental taking or fire, flood or other cause beyond the control of the landlord which renders the rental units uninhabitable. In such cases the landlord shall present proof to the Commission of the condition which is beyond his control. The Commission shall grant the removal permit promptly upon receiving proof that such condition exists.

SECTION 9.  RENT  STABILIZATION;  BASE  RENT CEILING

(a) *Rent Stabilization.* As of March 1, 1980, and for so long as the system of rent controls are set forth herein shall be in effect, no landlord may increase, offer to increase, or give notice of intent to increase the rent for a rental unit to an amount in excess of the base rent ceiling for that rental unit, except as provided in this Article.

(b) *Base Rent Ceiling.* The rent in effect on November 1, 1978 for any rental unit plus the allowable increase, as set forth below, shall constitute the base rent ceiling. The allowable increase, calculated as a percentage of the rent in effect as of November 1, 1978, is as follows:

(1) If the rent includes the cost of all utilities, the allowable increase is six (6) per cent, if heat only then five and one-half (5.5) per cent;

(2) If the rent includes the cost of the gas and electric utilities only, the allowable increase is five (5) per cent;

(3) If the rent includes the cost of gas and electric utilities, but not both, the allowable increase is four and one-half (4.5) per cent; or

(4) If the rent includes neither heat, gas nor electric utilities, the allowable increase is four (4) per cent.

(c) If there was no rent in effect for a rental unit on November 1, 1978, the base rent ceiling shall be the rent

that was charged on the first date that rent was charged following November 1, 1978, plus the portion of the allowable increase based on the number of months since rental, as stated above.

SECTION 10.   BASIC RENT INCREASES

(a)  Until the Commission sets the allowable annual basic rent increase, as provided for in (b) below, the allowable basic rent increase for a rental unit shall be the base rent ceiling for the rental unit plus the allowable increase, calculated as a percentage of the base rent ceiling, as follows:

(1)  If the rent includes the cost of all utilities, the allowable increase is seven (7) per cent, if heat only then six and one-half (6.5) per cent;

(2)  If the rent includes the cost of gas and electric utilities only, the allowable increase is five (5) per cent;

(3)  If the rent includes the cost of gas or electric utilities, but not both, the allowable increase is four and one-half (4.5) per cent; or

(4)  If the rent includes neither heat, gas nor electric utilities, the allowable increase is four (4) per cent.

Rent increases charged pursuant to this Section before May 1, 1980, are exempt from the requirements of Section 11 below; however, if a landlord charges a rent in excess of the amount of the base rent ceiling on a rental unit before May 1, 1980, the landlord shall notify the tenant in writing of the base rent ceiling for that rental unit and the method of determination of the proposed rent.

No landlord shall charge a rent increase, pursuant to this subsection, so long as the rental unit is not in substantial compliance with all applicable housing, health and safety laws. Rental units shall be considered in substantial compliance with housing, health and safety codes unless any

conditions therein endanger the life, health or safety of the tenant. The Commission shall consider all such possible endangering conditions in determining whether a rental unit is in substantial compliance with applicable codes.

(b) By January 1, 1981, and annually thereafter, the Commission shall set the allowable annual percentage basic rent increase for all rental units, based on the following provisions:

(1) Increases or decreases in maintenance expenses for the previous year;

(2) Increases or decreases in utility costs for residential rental properties; and

(3) Increases or decreases in property taxes.

In calculating the allowable annual percentage basic rent increases, the Commission shall rely on research on actual costs in the City of Baltimore and information from one or more public hearings to be held on the issue.

SECTION 11. BASIC RENT INCREASE PRO-
CEDURES

(a) To obtain a rent increase which is not in excess of the allowable basic rent increase, the landlord shall notify each tenant and the Commission at least sixty (60) days before the date upon which the increase is to become effective. The notice shall be in writing and signed by the landlord or his agent. The notice shall be delivered by first class mail, or in the case of notice to a tenant, it may be hand delivered with a signed receipt. Such notice shall include: the effective date of the proposed increase; the amount of percentage increase and the dollar amount of the increase as compared to the existing rent; the amount of the base rent ceiling for the rental unit; an affirmation that the rental unit is in substantial compliance with all applicable housing, health, and safety codes; a statement of the tenant's right to appeal the increase to the Commission; and a statement that it is

illegal for the landlord to evict a tenant for filing a complaint to any public agency, including the Commission.

(b) The tenant shall have the right to request of the Commission that the rent increase not be allowed. Such request shall state the reason why the landlord is not entitled to the increase and shall be filed with the Commission within fifteen (15) days of receipt of the notification.

(c) If the tenant does not contest the increase, the increase shall become effective on the date specified in the notice, unless the Commission invokes its power to initiate a review of the proposed increase within twenty (20) days of receipt of notification.

(d) No landlord shall increase the rent under this section if the rental unit does not substantially comply with all applicable housing, health and safety laws or if the landlord has failed to comply with this Article and the rules made thereunder by the Commission.

## SECTION 12.   EXTRAORDINARY RENT INCREASES

(a) When a basic rent increase is insufficient and would result in a hardship to the landlord or a landlord is not allowed a basic rent increase, as herein provided, the landlord may submit a request to the Commission for a rent increase in excess of the allowable basic rent increase. The landlord shall also notify the tenant prior to or concurrent with the request to the Commission in the same manner as provided in Section 11(a), above, stating that it is an extraordinary rent increase which is being sought. The request shall state the reasons for the proposed increase and shall contain an affidavit signed by the landlord or his agent containing the following information:

(1) Actual operating expenses by category for the rental unit(s) for a two-year period ending no more than four (4) months before the submission of the requests;

(2) Anticipated expenses for the next twelve (12)

months, including details of changes in tax and utility rates;

(3) Current and proposed rent schedules for each rental unit or for each type of rental unit;

(4) A schedule of fees and income from the property;

(5) The vacancy rate for each type of rental unit during the preceding two (2) years;

(6) Details of any other factors affecting the need for the proposed rent increase; and

(7) An affirmation that the rental unit(s) is in substantial compliance with all applicable housing, health and safety codes or shall be in substantial compliance within a reasonable time as determined by the Commission if the increase is granted.

(b) Any tenant or his designated representative or interested tenant organization may file with the Commission any comments on the proposed rent increases within thirty (30) days of receipt of notification of the proposed rent increase.

(c) In evaluating any request for an extraordinary increase in rent, the Commission shall consider the purposes of this Article and shall attempt to assure that rents are established at levels which avoid undue hardship on the landlord or the tenant. All relevant factors shall be considered, including:

(1) The amount of the proposed increase;

(2) Increases or decreases in taxes or utilities;

(3) Unavoidable increases or decreases in operating expenses, repairs and maintenance;

(4) Proposed capital improvements and the necessity of those improvements to maintain or to bring the rental unit(s) into substantial compliance with applicable housing, health and safety laws;

(5) Federal and State income tax benefits;

(6) Landlord's rate of return on his investment;

(7) Speculative nature of the investment and whether or not the property was acquired or is held as a long term investment;

(8) Whether or not the rate of the return on his investment is negatively affected by refinancing of the property within two (2) years prior to the request and whether such re-financing was a means of making major improvements to the property;

(9) Efficiency of operation; and

(10) Energy conservation measures taken or to be taken by the landlord.

(d) No landlord may submit a request for an extraordinary rent increase, if within the last six (6) months he was granted or denied a request for an extraordinary rent increase.

(e) A landlord may seek an extraordinary rent increase on more than one rental unit in any one request.

## SECTION 13.  RENT REDUCTIONS

(a) A tenant may request of the Commission a rent reduction if the tenant finds that the housing services or equipment are being withheld or the landlord has unilaterally changed the conditions of rental or that the rental unit is not now in substantial compliance with applicable housing, health or safety laws or additional fees are being levied or the rent charged is in excess of the allowable rent as herein provided. The tenant shall send a copy by first class mail of the request, prior to or concurrent with the request, to the landlord or the landlord's agent.

(b) The landlord shall have thirty (30) days from the receipt of the copy of the request to file comments opposing the rent reduction.

(c) If the determination is in the tenant's favor, the amount of the rent reduction shall be commensurate with the loss of services or equipment or change in conditions in accordance with this Article.

## SECTION 14.   HEARING PROCEDURES

(a)  A landlord or a tenant or a tenant organization or their designated representatives may make a request to the Commission as provided by this Article. The Commission or Executive Director may initiate a review of any rent increase request or suspected violation of this Article.

(b) Upon receipt of a request, or upon a Commission review, the Executive shall notify the interested parties (landlord, and/or tenant, and/or tenant organization and any persons or organization who filed comments) that a request has been filed, the nature of that request and the applicable time limits for comment.

(c)  Within forty-five (45) days of the filing of a request, the Executive Director shall either approve, disapprove or modify the request by written findings, opinions and orders, a copy of which shall be sent to the interested parties. The Executive Director may extend the time for issuing his decision by no more than thirty (30) days. The decision of the Executive Director shall be final unless appealed by the aggrieved party within ten (10) days of the receipt of the written findings, opinions and orders. The Executive Director may initially schedule and conduct within a reasonable time, a hearing on the request. Notice of the hearing and its time and place shall be given to the interested parties. Such hearing shall be in lieu of that provided for in subsection (d).

(d)  Any person aggrieved by a written decision may file a written notice of appeal to the Executive Director who shall schedule and conduct within a reasonable period of time, a hearing. Notice of the hearing and its time and place shall be given to all interested parties. Within a reasonable time, the Executive Director shall reverse, modify or affirm the action by written findings, opinions and orders, and provide a copy thereof to all interested parties. This decision shall be final unless appealed to the Commission by the aggrieved party within ten (10) days of receipt of the written findings, opinions and orders.

(e) If the Executive Director's decision is appealed, the Commission shall schedule a Commission hearing within a reasonable time, or shall summarily affirm the action by written findings, opinions and orders, and provide a copy thereof to all interested parties. The issuance of the written findings, opinions and orders of the Commission by virtue of either, a hearing or summary affirmance shall constitute final action of the Commission and any person aggrieved by such action may appeal to a court of competent jurisdiction.

(f) Any decision reached in subsection (c), (d), or (e) above shall not be stayed pending appeal; however, in the event that, on appeal, a decision is reversed or modified, the landlord or tenant shall be ordered to make retroactive payments to restore the landlord or tenant to the position he would have occupied had the initial decision been the same as the final decision. If an appeal to an initial decision is taken, the Executive Director in his discretion, may order the aggrieved party to pay the disputed sum of money into an escrow account of the Commission.

(g) In all hearings, the Executive Director or the Commission, as applicable, shall have the power to subpoena all witnesses and records deemed necessary. Subpoenas must be signed by the Chairperson of the Commission. Any party to a hearing may appear in person or by a duly authorized representative and may have the assistance of anyone of his choice. The parties may present testimony and evidence which shall be given under oath or by affirmation.

(h) All hearings shall be open to the public. The Commission shall keep a full record of all hearings, which shall be a public record. Upon request, any interested party to a hearing may receive a transcript of the hearing record, upon payment of charges necessary to meet costs.

(i) All decisions of the Commission shall be supported by the preponderance of available evidence. All decisions shall be consistent with the intent and purposes of this Article.

(j) All requests to the Commission pertaining to rental units in the same building or in properties owned by the

same landlord shall be consolidated for hearing where feasible.

(k) The Executive Director shall have authority to choose from his staff any individuals deemed to be competent for holding hearings and making reviews of requests.

(l) The Executive Director shall have authority to initiate an investigation for the purpose of verification of all information submitted in a request to the Commission.

## SECTION 15. DECONTROL

If the Commission finds that, based on its own research, the vacancy rate of residential rental units, which are not substandard, reaches or exceeds five (5) per cent, the Commission shall recommend to the Mayor removal of the system of rent controls contained in this Article, and upon such recommendation the Mayor and City Council may, by ordinance, remove or alter this system of rent controls.

## SECTION 16. NON-WAIVERABILITY

Any provision whether oral or written pertaining to a rental housing agreement, which seeks to waive any right or provision of this Article, which is for the benefit of the tenant, shall be deemed to be against public policy and shall be void.

## SECTION 17. PENALTIES

(a) Any landlord who demands, accepts or retains any rent for a rental unit in excess of the maximum allowable rent as herein provided, shall be subject to a fine of up to fifty dollars ($50.00) for each instance in which the excess rent was demanded or received and for full compensatory damages to the tenant from whom the excess rent was demanded or received.

(b) Any person who fails to file a registration statement, or who fails to comply with a subpoena of the Commission, shall be in violation of this Article and subject to a fine of up to seventy-five dollars ($75.00) for each such violation.

(c) Any person who removes a rental unit from the rental housing market without complying with the requirements of this Article shall be in violation of this Article and subject to a fine of up to one hundred dollars ($100.00) for each such violation.

(d) Any person who fails to provide proper notice as required herein shall be in violation of this Article and subject to a fine of up to twenty-five dollars ($25.00) for each such failure to provide proper notice.

(e) Any person against whom a fine is charged shall have the right to a review or a hearing, as applicable, including the right of appeal to a court of competent jurisdiction, as provided herein.

(f) In determining any fine to be imposed against any person, the Commission shall evaluate the following factors and the fine shall be commensurate with the severity of the violation:

(1) How many times the person has been found in violation of this Article; and

(2) Whether the person knowingly violated the Article; and

(3) Whether once the person knew of the violation, the person attempted to make restitution or to comply with the requirements.

(g) Penalties imposed pursuant to this section may be collected or enforced through civil attachment proceedings.

SECTION 18. CIVIL REMEDIES

Any landlord who demands, accepts or retains any payment of rent in excess of the maximum lawful rent, in violation of this Article, shall be liable to the tenant from whom such payment is demanded, accepted, received or retained for reasonable attorney's fees and costs, as determined by the court, plus damages in the amount of up to one hundred dollars ($100.00) for each such excessive rent payment demanded or paid or not more than three (3) times

the amount by which the rent payment, demanded, received or retained exceeds the maximum lawful rent, whichever is greater.

## SECTION 19. PARTIAL INVALIDITY

If any provision of this Article or any application thereof to any person or circumstance is held invalid, that invalidity shall not affect other provisions or applications of this Article which can be given effect without the invalid provision or application; and to this end, the provisions of this Article are declared to be severable. This section shall be liberally construed to achieve the purposes of this article and to preserve its validity.

THIS NOTICE IS GIVEN PURSUANT TO SECTION 5 OF ARTICLE XI-A OF THE CONSTITUTION OF MARYLAND.

*Cole, J., dissenting:*

Article XIA § 5 of the Maryland Constitution vests in the citizens of Baltimore City the right to amend their city charter. The only limitations imposed upon this right are found in §§ 2 and 6 of that article which together forbid the City from exceeding the powers granted by the State. Acting within these limitations, the voters of Baltimore City amended the charter by providing for a system of rent control.

Today, the majority of this Court, inserting its own limitations upon the City's right to amend, declares the amendment null and void as being legislative in character and not proper charter material. The majority reasons that a charter amendment must be limited in substance to that which alters the form or structure of government and, therefore, may not encompass subject matters within the City's police or general welfare powers. Stated differently, the majority holds that the rent control proposal can only be valid if the people share the legislative power with the City Council, and because Article XIA vests "full power" to enact local laws in the City Council the voters do not have the

right to approve an amendment which the City Council could enact as legislation. To hold otherwise, the majority contends, would permit the voters the right to initiate legislation which would constitute an impermissible enlargement or extension of those powers expressly granted. I disagree and, therefore, dissent.

The rationale by which the majority reaches its conclusion is nothing new; it has been advanced and rejected by many courts throughout the country. Years ago, opponents attacked the Eighteenth Amendment as legislative in character, as unrelated to the form and structure of government, and as violative of the constitution which vests all legislative power in Congress. The United States Supreme Court was unpersuaded and the amendment was upheld. *National Prohibition Cases,* 253 U.S. 350, 40 S. Ct. 486, 64 L. Ed. 946 (1920).

In *State v. Thompson,* 323 Mo. 742, 19 S.W.2d 642, 646 (1929) the Missouri Supreme Court was presented with an amendment involving a lengthy and complex system providing for the raising of state highway bonds. Here, too, the opponents of the amendment claimed it was legislative in character. That court stated that "[w]ith respect to the matters of details as affecting its validity, it is only necessary that such amendment conform to the requirement of . . . the Constitution . . . ." that no amendment contain more than one subject. Nine years later the same court was again faced with a challenge to an amendment to the state's constitution on the ground that it was legislative in character. *Marsh v. Bartlett,* 343 Mo. 526, 121 S.W.2d 737 (1938). Again the Missouri Supreme Court held that the only limitation on the amendment was "singleness of subject matter."

These same principles which apply to the amendment of the federal and state constitutions apply equally to the amendment of municipal charters subject to the added qualification that the amendment conform to the state constitution and be consistent with the general laws of the state. In *State ex rel. St. Louis F.F. Ass'n Loc. No. 73 v.*

*Stemmler,* 479 S.W.2d 456 (Mo. 1972), an amendment to the charter of the City of St. Louis was challenged on the ground that the power to fix salaries was a legislative responsibility which could not be exercised by the people. The Missouri Supreme Court held that the people of the city had the right to write into their charter any provision they wished subject only to the restrictions of federal and state law. The court said:

> A consideration of this question necessitates a recognition of the basic fact that the people themselves are the source of all governmental power. Their will is supreme. They spell out in their constitution what form their government shall take and what powers it shall have.
>
> \* \* \*
>
> [W]e find that the people of Missouri, by provisions written into the state constitution . . ., have said that the people of St. Louis may write their own charter for their city government. [*Id.* at 458].

Other courts have impliedly if not expressly sustained this fundamental right of the people to amend their constitution. In *City of Jackson v. Nims,* 316 Mich. 694, 26 N.W.2d 569 (1947), the Supreme Court of Michigan, in rejecting an attack on a constitutional amendment providing for a return of one cent of state sales tax to be divided among cities, villages, townships and schools, stated:

> In the present situation the proposal has been adopted by the voters as an amendment to the Constitution. There is no merit in the claim that it must now be set aside on the ground that the proposal should have been initiated as legislation.
>
> "The people have an inherent right to so amend the Constitution so as to take away from, or add to, the powers of either department of the government." *People v. Cook* (syllabus), 147 Mich. 127, 110 N.W. 514.

*See Downs v. City of Birmingham,* 240 Ala. 177, 198 So. 231 (1940); *In re Interrogatories by the Governor, etc.,* 99 Colo. 591, 65 P.2d 7 (1937). Thus, I believe that the majority's conclusion on the threshold question as to whether a charter amendment may be legislative in character violates the basic democratic principle that the people have the right to determine for themselves by what rule of conduct they shall be governed, so long as that rule does not conflict with some higher authority such as federal or state law.

However, in any event, I disagree with the conclusions they draw from their examination and construction of the various sections of Article XIA. The majority misses the mark. It proceeds to an intricate analysis of §§ 2, 3, and 6 and concludes that the amendment divests the City Council of its power to legislate in the area of rent control and thus enlarges the powers granted to the City. Section 3 has nothing at all to do with the process of amending the charter; it merely empowers the council to enact local laws. It is only when this section is read in conjunction with §§ 2 and 6 that the majority finds a limitation on the § 5 amendment power. In analyzing these sections the majority misconstrues the basic purposes of the limitations found therein.

These limitations are aimed at preventing the political subdivision (the City) from attempting to use the charter amendment process to authorize legislation over subject matter areas beyond those which the State has expressly granted the City and they are in no sense aimed at restricting the people's rights in relation to their own legislative body.

Section 6 provides:

> The power heretofore conferred upon the General Assembly to prescribe the number, compensation, powers and duties of the County Commissioners in each County, and the power to make changes in Sections 1 to 6 inclusive, Article XI of this Constitution, when expressly granted as

> hereinbefore provided, are hereby transferred to the voters of each County and the voters of City of Baltimore, respectively, provided that said powers so transferred shall be exercised only by the adoption or amendment of a charter as hereinbefore provided; and provided further that this Article shall not be construed to authorize the exercise of any powers in excess of those conferred by the Legislature upon Counties or City as this Article sets forth.

The majority states that "the power of the City voters under § 6 ... is restricted ... that such authority may not be exercised in violation of others powers vested in the City ...." By using the phrase "in violation of" the majority is able to conclude that the rent control amendment conflicts with § 3 claiming it divests the City Council of its power to legislate on the subject of rent control. But § 6 does not say "in violation of." It says that the power to amend may not be "construed to authorize the exercise of any powers *in excess* of those conferred by the Legislature upon said ... City ...." When considered in light of the purpose of the Home Rule Amendment, it becomes clear that the majority has misunderstood the purpose of this express limitation.

The purpose of the Home Rule Amendment was to provide for the distribution of power between the Legislature and the political subdivisions of the State. The purpose of the limitations in §§ 2 and 6 is to insure that the political subdivisions do not exceed the power distributed to them. I repeat, they have nothing to do with the people's rights as those rights relate to their local legislative body. Thus § 6 merely forbids the use of amendment power by the political subdivision to grant unto itself more power than has been granted by the State. It has nothing to do with who within the subdivision the people may designate or permit to exercise that power.

Section 2 provides:

> The General Assembly shall by public general

law provide a grant of express powers for such County or Counties as may thereafter form a charter under the provisions of this Article. Such express powers granted to the Counties and the powers heretofore granted to the City of Baltimore, as set forth in Article 4, Section 6, Public Local Laws of Maryland, shall not be enlarged or extended by any charter formed under the provisions of this Article, but such powers may be extended, modified, amended or repealed by the General Assembly.

To understand the limitations of § 2 it is necessary to recognize that the Home Rule Amendment does not empower the local subdivisions to legislate over any particular subject matter. It is only when the General Assembly expressly grants to the subdivision the power to act in a given field that the subdivision may do so. For example, unless the General Assembly has granted the political subdivision the power to enact provisions pursuant to the police power the subdivision has no authority to enact any law under that power. In the case of home rule counties, the expressly granted powers are conferred by Article 25A of the Maryland Code. In the case of Baltimore City the grant of express powers is found in the charter itself; this is so because the General Assembly had by public local law granted to the City certain express powers many years before the adoption of the Home Rule Amendment. These are the powers to which the limitation (subject matter and nothing more) refers. The majority agrees that the adoption of a system of rent control is within the police power expressly granted to the City. They should agree also that therefore the amendment in question does not represent an extension or enlargement of the powers granted the City.

The majority contends that § 3 grants to the City Council full power to enact local laws and therefore precludes the people from adopting this amendment because it would divest the council of its powers to legislate on rent control. The majority equates full with exclusive and in so doing

ignores the plain language of our holding in *Ritchmount Partnership v. Board,* 283 Md. 48, 63, 388 A.2d 523 (1978).

Likewise, the declaration in § 3 that the council have "full power" to enact local laws does not imply exclusivity. Rather, it is more likely that the phrase "full power" was meant to describe the *quality* of the legislative power vested in the council and granted by the General Assembly. In other words, with respect to the powers delegated to it, the County Council is to have as ample and complete power to legislate over local affairs as the General Assembly possessed prior to the ratification of Article XIA and the enactment of the Express Powers Act. Thus, while Article XIA, § 3 bestows upon the county council ample and complete power to legislate within the limits set forth in the Express Powers Act, it does not necessarily confer the exclusive power to do so. [citations omitted].

On this premise, even though *Ritchmount* dealt with the right to petition to referendum reserved by the people, there is no reason the people by charter amendment could not place the subject matter of rent control in the hands of a commission over which, by virtue of such charter creation, the City Council may have to *share* its delegation of police power.

The majority attempts to limit *Ritchmount* to the power of referendum and to distinguish the power of initiative. The referendum according to the majority is merely an after-the-fact power to pass upon the legislative action of the council while the initiative is the power to actually initiate legislation. The majority contends that the exercise of initiative by the people is therefore inconsistent with the primacy of the council as the elected lawmaking body. The majority seems to ignore footnote 10 in *Ritchmount.*

10. Seeking to circumvent the restrictions imposed by § 3, appellees contend that the referendum power is in effect a veto and therefore is not properly

considered to be an exercise of legislative power in conflict with the lawmaking authority vested in the county council of charter counties. While there is some authority to support this position, . . . the better reasoned view, in our opinion, is that the referendum, as well as the veto power vested in the executive, is an aspect of the legislative power much like that invoked by the Senate when it considers a bill passed by the House. [citations omitted].

In other words, the basis for the *Ritchmount* decision was not that the power of referendum was an after-the-fact veto like power; to the contrary, this note makes clear that the basis for our decision was that the people shared the legislative power with the council.[1] Any doubt about this interpretation can be resolved by an examination of the cases which we cited in *Ritchmount*:

In *State v. City of Duluth,* 134 Minn. 355, 159 N.W. 792, 795 (1916) the court said:

Requiring a legislative body to be a feature of all home-rule charters does not necessarily mean that no legislative functions can be exercised by any other body. While the legislative body undoubtedly becomes the repository of all legislative power possessed by the city and not expressly given to some other body, we find nothing in the language of the Constitution which requires us to hold that no legislative power can be given to the electors.

In *Pitman v. Drabelle,* 267 Mo. 78, 183 S.W. 1055, 1057 (1916), that court said:

It is of the very essence of free government that the laws regulating a community should reflect the view and voice of a majority of the voters. Hence the plan (initiative) by which the people are empowered to do the business which their recalcitrant

---

1. It is clear that a charter amendment which is legislative in character would have the tendency to preempt the field for the legislative body except in so far as it permitted that body to implement the people's expressed desire.

representatives have failed to perform has met with full judicial sanction.

... We are unable to find anything in the language of the Constitution under review which prohibits the people of St. Louis, after having provided in their charter for one house of legislation, to reserve to themselves the power to legislate in case of the refusal of that body to act. [citations omitted].[2]

We cited these cases as support for our statement in *Ritchmount* that the vesting of full power to legislate in the council did not "altogether preclude the existence of other entities [e.g., the people] with coordinate legislative powers." [283 Md. at 63 (emphasis added)]. I believe *Ritchmount* was correctly decided.

The majority, in its analysis, appears to lump together the question of whether the people may use the charter amendment process to enact material which is legislative in character with the question of whether the people may provide in their charter for a mechanism by which they may exercise the initiative over local laws. In doing so, the distinction between charter initiative (the power to amend the charter) and the power to initiate local laws (ordinances) has slipped between the cracks. In any event, the second question is not before the Court for decision.

The issue we are called upon to decide is whether the voters of Baltimore City have the power to enact a system of rent control by charter initiative. I believe that, consistent with the limitation that the amendment must not exceed the general laws of the state, the people of Baltimore City have the sovereign right to insert in their charter any provision they desire.

---

**2.** The only authority cited by the majority is a New York case, Astwood v. Cohen, 291 N.Y. 484, 53 N.E.2d 358 (1944). A proposed amendment to the New York City Charter would have provided for the payment of a salary bonus to every policeman and fireman in the city. The New York Court of Appeals found the amendment invalid because it amended nothing in the city charter, the provisions for salaries of policemen and firemen being in the administrative code. In the same year *Astwood* was decided the New York Legislature amended its home rule law to include the provisions, "[a] charter amendment may be of any extent and deal with any number of subjects."