WILSON ET AL. *v.* BOARD OF SUPERVISORS OF
ELECTIONS OF BALTIMORE CITY ET AL.

[No. 177, September Term, 1974.]

*Per Curiam Order October 24, 1974.*

*Opinion Filed December 4, 1974.*

## PER CURIAM ORDER

For reasons to be stated in an opinion to be filed later, it is this 24th day of October, 1974

ORDERED, by the Court of Appeals of Maryland, a majority of the Court concurring, that the judgment of the Circuit Court of Baltimore City, denying the injunctive relief prayed in the bill of complaint be, and it is hereby, affirmed with costs; and it is further

ORDERED, that the mandate be issued forthwith.

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE and O'DONNELL, JJ., and CHARLES E. ORTH, JR., Chief Judge of the Court of Special Appeals, specially assigned.

*Daniel B. Leonard* and *Benjamin C. Howard* for William H. C. Wilson, part of appellants. *Michael J. Milton, Special Assistant Attorney General,* for other appellant.

*Michael A. Pretl* for the Memorial Stadium Task Force, Inc., et al., part of appellees. No brief filed on behalf of Board of Supervisors of Elections of Baltimore City, other appellee.

SMITH, J., delivered the opinion of the Court. MURPHY, C. J., and ORTH, J., dissent and MURPHY, C. J., filed a dissenting opinion in which ORTH, J., concurs at page 304 *infra.*

We shall here give our reasons for our affirmance by a per curiam order on October 24, 1974, of a trial judge's denial of the request of appellants, William H. C. Wilson *et al.*

(Wilson), that the Board of Supervisors of Elections of Baltimore City be enjoined from submitting a proposed amendment to the Baltimore City Charter (the Charter) to the voters of that city at the general election on November 5, 1974.

What was proposed was the addition of a new section to Art. I of the Charter, to be known as § 9, to read as follows:

"9. STADIUM. The Memorial Stadium on 33rd Street shall be a memorial in tribute to the Veterans of our nation's wars. In order to perpetuate this memorial as well as to protect the taxpayers' interests, no other stadium for professional football, professional soccer and/or professional baseball shall be constructed in the City of Baltimore with the use of public funds, public credit or public guarantee for the financing thereof in whole or in part."

This proposed amendment was certified to the Board of Election Supervisors by the Deputy Treasurer of Baltimore City on July 22, 1974, having been filed by petition of certain voters. Wilson filed his suit August 16, 1974, in the Circuit Court of Baltimore City as "a resident, taxpayer and qualified voter of Baltimore City," saying he was "interested in the economic well-being, culture and vitality of Baltimore City, deriv[ing] enjoyment and recreation from watching professional football, baseball and other professional sports, and [that] these sports contribute[d] to the promotion of tourism and the increase of business and employment opportunities in Baltimore City." The bill of complaint claimed that the proposed charter amendment was in conflict with Maryland Code (1957, 1971 Repl. Vol., 1974 Cum. Supp.) Art. 41, §§ 141-152J, the Maryland Sports Complex Authority Act (the Act), enacted by Chapter 178 of the Acts of 1972, because the Act, "while it does not specifically mandate that the contemplated new stadium be in Baltimore City, clearly authorized its location in Baltimore City; gives eminent domain power only as to the Camden Yards Area (Section 145 (h)), which is in Baltimore

City," and "[t]hus, the State law permits, authorizes and provides for a new stadium or sports complex for professional sports in Baltimore City." It was further alleged that § 145 of the Act "authorizes or permits the Authority to receive funds, whether as loans or grants, from any private, public or governmental source (except from the State of Maryland under certain conditions) and to issue revenue bonds the interest on which would be exempt from Federal and State income taxes," but that the proposed amendment to the Charter "would prohibit the construction of a new stadium in Baltimore City so financed."

The defendants named in the bill of complaint were the individual members of the Board of Supervisors of Elections of Baltimore City. Ten days after the filing of the bill of complaint, leave was sought by and granted to the Memorial Stadium Task Force, Inc., and Hyman Aaron Pressman and Charles F. Rose to intervene as parties defendant.[1] Their petition alleged that Memorial Stadium Task Force, Inc., "is a non-profit corporation of the State of Maryland, the primary and stated purpose of which is 'to endeavor by all legitimate and available means to retain and enhance the property and institution of Memorial Stadium on 33rd Street, and the environs thereof.' " Subsequently, leave was granted to the Maryland Sports Complex Authority, created by the Act, to intervene as a party plaintiff.

The parties agreed that there was no dispute as to facts, that no testimony was required, and that the chancellor should finally dispose of the matter, after argument, on the pleadings. In a comprehensive and well-reasoned opinion the chancellor (Howard, J.) held that "if a majority of the voters of the City of Baltimore wish to limit the expenditure of public funds for recreational facilities to those existing on 33rd Street, there seems to be no valid reason in law to forbid them through referendum from so doing." He then signed an order sustaining the demurrer of the intervening defendants without leave to the plaintiffs to amend. The

---

1. Mr. Pressman is the Comptroller of the City of Baltimore.

parties had agreed at a conference in the chambers of the chancellor in advance of hearing that if he concluded that the amendment if approved would be valid, then he would pass such an order.

After the filing of separate appeals to the Court of Special Appeals by Wilson and the Sports Complex Authority, the parties jointly petitioned this Court for the writ of certiorari and for advancement of the case for argument to the end that there might be a final determination of the matter prior to the general election on November 5, 1974. We concluded that it was in the public interest that this be done. Therefore, we granted the writ and advanced the case for argument.

The parties are in agreement that the sole question presented here is whether the proposed amendment to the Charter is in irreconcilable conflict with the Act.[2]

It may be well at the outset to set forth the law applicable in a review such as this. This Court has previously entertained taxpayers' suits challenging the validity of proposed amendments to the Charter in which cases our predecessors determined that the submission of such amendments to the voters of Baltimore City should be enjoined. *Williams v. Broening, Mayor*, 135 Md. 226, 108 A. 781 (1919), and *Jones v. Broening, Mayor*, 135 Md. 237, 108 A. 785 (1919). In *Schneider v. Lansdale*, 191 Md. 317, 61 A. 2d 671 (1948), the Court considered and held valid, in the face of attack from certain Montgomery County taxpayers, a proposed charter for that county which was slated to be voted upon at the coming general election. A statute is presumed to be valid and one attacking its validity has the burden of affirmatively and clearly establishing its invalidity. *Salisbury Beauty Schools v. St. Bd.*, 268 Md. 32, 48, 300 A. 2d 367 (1973). A charter provision is entitled to the same presumption of validity applicable to any regularly adopted law. *Connor v. Board of Supervisors*, 212 Md. 379, 383, 129 A. 2d 396 (1957), and *County Commissioners v.*

---

2. We understand that the voters of Baltimore City adopted this amendment at the recent general election.

*Supervisors of Elections,* 192 Md. 196, 207-08, 63 A. 2d 735 (1949). When two constructions of a statute are possible, one of which would render it invalid as in conflict with the Constitution and the other of which would avoid any conflict, we adopt the construction that avoids conflict. 3 Antieau, *Municipal Corporation Law* § 25.05 at 444 (1974); 2 McQuillin, *Municipal Corporations* § 9.22 at 686 (3d ed. 1966 rev. vol.); *Acting Director, Dep't of F. & P. v. Walker,* 271 Md. 711, 718-19, 319 A. 2d 806 (1974); *City of Baltimore v. Concord,* 257 Md. 132, 140, 262 A. 2d 755 (1970); and cases cited in both Maryland cases. Although the point was made at argument that because this was before us as a *proposed* charter amendment the presumption of validity normally accorded a statute did not apply, it is obvious that the presumption must apply since we are asked to determine whether the charter amendment would be valid *if adopted.* Any conflict between a county or city charter and a public general law must be resolved in favor of the public general law.[3] Maryland Constitution Art. XI-A, §§ 1 and 3; and *Montgomery County v. Yost,* 223 Md. 150, 156, 162 A. 2d 462 (1960). *See also, Northampton Corporation v. Prince George's County, Maryland,* 273 Md. 93, 327 A. 2d 774 (1974). In *City of Baltimore v. Sitnick & Firey,* 254 Md. 303, 255 A. 2d 376 (1969), Judge Finan said for the Court:

> "A distillation of the opinions we have cited leaves the residual thought that a political subdivision may not prohibit what the State by general public law has permitted, but it may prohibit what the State has not *expressly* permitted. Stated another way, unless a general public law contains an express denial of the right to act by local authority, the State's prohibition of

---

3. In a non-charter county where statutes are enacted as public local laws by the General Assembly rather than by the local legislative body, the rule would be different since Code (1957) Art. 1, § 13, unchanged since its enactment as part of the Code of 1888, provides:

"Where the public general law and the public local law of any county, city, town or district are in conflict, the public local law shall prevail."

certain activity in a field does not impliedly guarantee that all other activity shall be free from local regulation and in such a situation the same field may thus be opened to supplemental local regulation." *Id.* at 317. (Emphasis in original.)

We now proceed to apply that law to the case at hand. In so doing we point out that although the contention of Wilson is that the charter amendment is "invalid" and we have referred to "validity," actually the proper terminology would be that if there is a conflict between a charter provision and a public general law the charter provision would be inoperative. *See Northampton, supra,* and *Prince George's County v. Maryland-Nat'l Cap.,* 269 Md. 202, 226, 306 A. 2d 223, *cert. denied,* 414 U. S. 1068 (1973). A charter provision which is otherwise valid, but inoperative because of such a conflict, would become operative if the conflict were eliminated by the repeal of the public general law. Likewise, a charter provision otherwise valid and operative, because of lack of conflict, would become inoperative if a later public general law created a conflict, since the public general law is to prevail over charters.

In applying the law to this case we take cognizance of the fact that there has been some suggestion that the proposed amendment forbids the construction of *any* stadium for professional sports in the City of Baltimore. Obviously, such an interpretation of the charter amendment would render the amendment inoperative as in conflict with the Act. The ordinary meaning of the words used in the amendment compels an interpretation that its *only* restriction is the construction of a stadium with public funds. In that regard there are two constructions that can be placed upon the amendment. The first is that it forbids erection of a stadium for professional sports in the City of Baltimore with *any* public funds. This would run directly contrary to the Act and would be unconstitutional as beyond the powers of the City of Baltimore. The other construction is that it forbids erection of such a stadium with public funds of the City of Baltimore. Subsections (m) and (n) of § 145 of the Act provide power to the Sports Complex Authority:

"(m) To borrow money from any person, governmental entity or private entity, and to pay interest thereon if borrowed from the State of Maryland, and to mortgage or otherwise encumber its property for such loans;

"(n) To receive and accept from any source, private or public (except the State of Maryland), contributions, gifts or grants of money or property . . . ."

It is contended by Wilson that "[t]he amendment would prohibit the use of any such [public] funds for the construction of another stadium for professional sports in Baltimore City." The powers of the City in this regard, and thus of this amendment, can go no further than to prohibit the expenditure of funds of the City of Baltimore.

We see no difference between the situation that would prevail without this charter amendment if the representatives of the people of Baltimore City, the City Council, determined that no funds of the City of Baltimore should be spent on a relocated stadium and the situation which would prevail if this amendment were adopted, in which case the people of the City of Baltimore, the final masters, would be making a similar declaration. Therefore, applying the doctrine that if it is possible to construe this charter provision so as to avoid conflict with the Constitution or any public general law we should do so, we hold that the effect of this amendment is only to prohibit construction in the City of Baltimore of such a stadium with funds of the City of Baltimore and it is thus valid and operative.

We are not to be understood in this opinion as holding in any way that this amendment forbids construction of a sports stadium in Baltimore City other than at the site of the present Memorial Stadium, nor are we holding that this amendment has any applicability to the expenditure of any public funds other than those of the City of Baltimore.

*Murphy, C. J., dissenting:*

Even if the majority's construction of the charter amendment as prohibiting only the use of Baltimore City public funds and credit in the construction of a new stadium in the city is accepted, an irreconcilable conflict nevertheless exists between the amendment and the Maryland Sports Complex Authority Act (the Act), Maryland Code (1957, 1971 Repl. Vol., 1974 Cum. Supp.) Art. 41, §§ 141-152J.

The Act, a public general law, establishes a state agency known as the Maryland Sports Complex Authority. § 144 (a). The Act provides in § 145 (a) that it is the purpose of the Authority "to provide for a sports complex and related facilities in the Greater Baltimore Region for professional sports teams, athletic contests, and other activities; to provide for other revenue-producing facilities in the environs of the sports complex in order to help defray the costs of constructing, maintaining and operating the sports complex; and to provide for the financing of the sports complex and other facilities in such manner that the revenues derived therefrom, as well as from any other authorized sources, completely pay for the construction, maintenance and operation of the complex and facilities so that no State funds shall be needed or used." As defined in § 143 (d), the Greater Baltimore Region within which the sports complex and related facilities must be built embraces Baltimore City and the five surrounding counties of Anne Arundel, Baltimore, Carroll, Harford, and Howard. The Act invests the Authority with a wide range of powers to effectuate its governmental purposes, including the power to issue bonds, notes and other obligations, to borrow money from any governmental entity, and to receive and accept from such governmental entities, except the State of Maryland, contributions, gifts, or grants of money or property. §§ 145-150. Section 152 (c) provides that bonds and notes issued by the Authority are securities in which political subdivisions of the State may legally and properly invest. In a "Declaration of legislative findings and policy" accompanying the Act, the General Assembly declared "that

professional sports add to the economy, the culture and the vitality of Baltimore City, the Greater Baltimore Region and the entire State of Maryland"; that "[p]rofessional sports stimulate tourism and familiarize people from all parts of the country with the advantages of the Baltimore metropolitan area and with Maryland generally"; that professional sports "stimulate business and provide extensive employment opportunities, not merely for the athletes and personnel directly involved in the sports enterprise but for thousands of other Marylanders"; that "[p]rofessional sports also provide the citizens of this State with a great deal of enjoyment and recreation in watching athletic contests"; and that it is the policy of the State of Maryland "[b]ecause of these public benefits, ... to encourage and assist the retention of professional sports activities in the Baltimore metropolitan area . . . ." Section 142.

From the foregoing provisions, it is wholly apparent that the Legislature contemplated in particular that political subdivisions comprising the Greater Baltimore Region would be empowered, and would retain the authority, to participate financially in the construction of a sports complex. It is true, of course, that Baltimore City would not be required to give, lend or invest funds for that purpose, but the Act plainly invests the City with discretion to do so. The charter amendment totally circumscribes — indeed cancels — the City's authority in this respect. At the same time, the amendment diminishes the Authority's powers. In effect, the charter provision amends the Act so that the Authority cannot borrow from *any* governmental entity or accept gifts from *any* public source or issue bonds and notes in which *any* public agency can invest. Indeed, the prime source — Baltimore City — is eliminated. Thus, the charter amendment prohibits what the public general law has permitted, *City of Baltimore v. Sitnick*, 254 Md. 303, 317, 255 A. 2d 376, 382 (1969), and must fall as in direct conflict with State law in violation of Article XI-A of the Constitution of Maryland. *County Council v. Investors Funding*, 270 Md.

403, 312 A. 2d 225 (1973); *Heubeck v. City of Baltimore,* 205 Md. 203, 107 A. 2d 99 (1954).

Under the majority's opinion, each of the home rule counties, which along with Baltimore City, comprise the area in which the sports complex is to be constructed, would be permitted to enact similar amendments to their charters and thus assure the destruction of a public general law enacted by the General Assembly for the benefit of all the people of the State. Such a result is completely at odds with the Constitution of Maryland.

I am authorized to say that Judge Orth concurs in this dissent.