558 A.2d 724

**MARYLAND STATE ADMINISTRATIVE BOARD OF ELECTION LAWS et al.**

v.

**TALBOT COUNTY, Maryland et al.**

**No. 74, Sept. Term, 1988.**

Court of Appeals of Maryland.

Oct. 7, 1988.

Opinion June 8, 1989.

**334**

Ralph S. Tyler, Asst. Atty. Gen. (J. Joseph Curran, Atty. Gen., Jack Schwartz, Asst. Atty. Gen., all on brief), Baltimore, Diana G. Motz (Frank, Bernstein, Conaway & Goldman, both on brief), Baltimore, for petitioners.

Roger D. Redden (Kurt J. Fischer, Piper & Marbury, all on brief), Baltimore, Anne C. Ogletree (Hairston, Gorman, Ogletree & Greenleaf, both on brief), Denton, for respondents.

Argued Before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, BLACKWELL, and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals of Maryland, retired, Specially Assigned, JJ.

## ORDER

PER CURIAM.

For reasons to be stated in an opinion later to be filed, it is this 7th day of October, 1988:

ORDERED, by the Court of Appeals of Maryland, a majority of the Court concurring, that that part of the judgment of the Circuit Court for Talbot County declaring Section 216 of the Talbot County Charter unconstitutional and enjoining the placement of the Detention Center Initia-

tive on the November 8, 1988 General Election Ballot is affirmed. As to this part of the judgment, the mandate shall be issued forthwith, and it is further:

ORDERED that judgment of this Court, as to that part of the judgment of the Circuit Court relating to attorney fees, expenses, and costs, will await filing of the Court's opinion in this case.

MURPHY, Chief Judge.

At issue in this case is the constitutionality of § 216 of the Talbot County Charter which authorizes voter-initiated legislation upon petition of ten percent of the County's registered voters.[1] In a declaratory judgment action, the Circuit Court for Talbot County (Wise, J.) found this provision of the charter to be violative of Article XI–A of the Maryland Constitution (the Home Rule Amendment) and enjoined placement of a direct legislative initiative involving a county detention center on the November 8, 1988 General Election ballot. By per curiam order dated October 7, 1988, we affirmed that part of the court's judgment. We now give our reasons for that determination.

I.

On May 12, 1987, the County Council of Talbot County voted to locate a new County Detention Center at the so-called "car-wash" site in the Town of Easton, a location approximately 700 feet from the existing county jail. A

---

1. Section 216 provides:

"(a) A bill may be initiated by the voters upon petition, in the form prescribed by law, of not less than ten per centum of the qualified voters of the County as of January 1 of the current year. Initiated bills shall conform to the requirements provided in Section 213(a) of this Charter, except that the bill shall be styled: "Be it enacted by the People of Talbot County, Maryland." The petition shall be filed with the Board of Supervisors of Elections of Talbot County.

(b) If a petition is filed, the bill shall be referred to the qualified voters of the County at the next ensuing regular election held for members of the House of Representatives of the United States. If the bill is approved by a majority voting thereon, it shall take effect thirty calendar days thereafter."

number of citizens and community organizations expressed their disapproval of this site at a public meeting and by writing letters to the Council and to a local newspaper. The Council declined to change its decision. Thereafter, purporting to exercise their direct voter-initiative rights under § 216, the protesters gathered over 2,000 signatures in support of a bill to add a new subsection to the Talbot County Code to provide: "That no detention center, jail, or other correctional facility be constructed, and operated within five hundred (500) feet of a church, school, cultural building, library, recreational area, or residence." [2]

On June 17, 1988, the County Council and James M. Slay filed a declaratory judgment action in the Circuit Court for Talbot County naming the County Board of Supervisors of Elections (the local board) and the Maryland State Administrative Board of Election Laws (SABEL) as defendants. The plaintiffs sought to have § 216 declared unconstitutional as in violation of Article XI–A of the Maryland Constitution, to have the initiative declared void, and to enjoin SABEL and the local board from placing the initiative on the ballot.

Earlier, the Political Action Committee of Ward Four, an unincorporated association, and Gerald Gibson sued the County Council, seeking a declaratory judgment as to their rights and remedies with respect to the site of the proposed new jail, its construction, and the legality of the expenditure of taxpayer funds for the jail. The suit also sought to enjoin the County Council from entering into any contract for the construction of the new jail. On July 1, 1988, the County Council and Slay filed an amended complaint naming, as additional defendants, the Political Action Committee of Ward Four, Gerald Gibson, and John A. Henry (the private defendants). The amended complaint identified the Political Committee as composed of registered voters and taxpayers actively engaged in furthering the aims of the

---

2. This provision, if enacted, would have made it unlawful for the Council to construct the new detention center on the proposed site.

detention center initiative. It identified Gibson as the Committee's Treasurer, a signatory to the initiative petition, one of the individuals primarily responsible for the circulation and filing of the petition, and a plaintiff in the aforementioned suit against the Council. Henry was also identified as a signatory to the petition and an active proponent of its purpose.

SABEL and the private defendants each moved to dismiss the action filed against them, claiming that the issue sought to be adjudicated by the County and Slay was not justiciable for lack of a proper adverse party. Both motions were denied. Thereafter, the County and Slay and the private defendants each moved for summary judgment. On August 23, 1988, the circuit court issued a declaratory judgment, holding § 216 of the charter to be unconstitutional under *Cheeks v. Cedlair Corp.*, 287 Md. 595, 415 A.2d 255 (1980), and enjoining placement of the initiative on the ballot. SABEL and the private defendants appealed. We granted certiorari prior to decision by the Court of Special Appeals to consider the important questions raised in the case.

## II.

The Maryland Uniform Declaratory Judgments Act, Maryland Code (1973, 1984 Repl.Vol.) § 3–401 *et seq.* of the Courts and Judicial Proceedings Article, provides in § 3–409(a) that:

"... a court may grant a declaratory judgment or decree in a civil case, if it will serve to terminate the uncertainty or controversy giving rise to the proceeding, and if:

(1) An actual controversy exists between contending parties;

(2) Antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation; or

(3) A party asserts a legal relation, status, right, or privilege and this is challenged or denied by an adversary party, who also has or asserts a concrete interest in it."

We have said time and again that the existence of a justiciable controversy is an absolute prerequisite to the maintenance of a declaratory judgment action. *See Boyds Civic Ass'n v. Montgomery County*, 309 Md. 683, 689, 526 A.2d 598 (1987); *Hatt v. Anderson*, 297 Md. 42, 45, 464 A.2d 1076 (1983). As we observed in *Boyds*, 309 Md. at 690, 526 A.2d 598, a justiciable controversy is one where there are interested parties asserting adverse claims upon a state of facts which must have accrued wherein a legal decision is sought or demanded. SABEL and the private defendants argue that the circuit court erred in not dismissing the case for lack of justiciability. We disagree.

■ Justiciability encompasses a number of requirements. *See Reyes v. Prince George's County*, 281 Md. 279, 288, 380 A.2d 12 (1977). For example, the issue presented to the court must be "ripe" for decision; a court should not decide moot, theoretical or abstract questions. *Hamilton v. McAuliffe*, 277 Md. 336, 353 A.2d 634 (1976); *Liss v. Goodman*, 224 Md. 173, 167 A.2d 123 (1961); *Davis v. State*, 183 Md. 385, 37 A.2d 880 (1944). Moreover, the plaintiffs must have standing to bring the suit. *Montgomery County v. Board of Elections*, 311 Md. 512, 536 A.2d 641 (1988); *Citizens P. & H. Ass'n v. County Exec.*, 273 Md. 333, 329 A.2d 681 (1974). And there must be an "actual controversy" which exists between the parties. § 3–409(a)(1).

SABEL and the private defendants contend that the "wrong plaintiffs" are suing the "wrong defendants." The Council, they argue, is an improper plaintiff because it is bound to uphold the County Charter and because the legality of a presumptively valid charter provision cannot be attacked by the political subdivision which enacted it, citing *Harford County v. Schultz*, 280 Md. 77, 85, 371 A.2d 428 (1977). They further claim that Slay, who is a taxpayer and registered voter of Talbot County, has no standing to sue because he is the County Attorney of Talbot County and, as such, may not attack the validity of a charter provision.

*Harford County v. Schultz, supra,* involved a challenge by the County to a charter amendment which had been

proposed by the Harford County Council. Noting that the County's rights, status, or other legal relations had not been adversarily affected by its own deliberately intended enactment of an amendment to its own charter, we dismissed the case for want of justiciability. 280 Md. at 87. In the present case, the County Council and Slay attack a charter provision which was enacted in 1973 by the Talbot County Charter Commission and subsequently approved by the County's voters. As we noted in *Schultz,* in the usual case the County defends an attack on a charter provision. 280 Md. at 86, 371 A.2d 428. Here, the Council claims that it cannot be expected to defend a charter provision which it did not enact and which totally undermines its constitutional authority under the Home Rule Amendment to be the primary legislative body in Talbot County. Since the focus of the Council's constitutional attack is upon § 216 of the County Charter, it urges that it had the requisite standing to maintain the declaratory judgment action.

As to Slay's standing to bring the action, the private defendants point out that under § 402(b) of the charter, the County Attorney is "the chief legal officer of the County, conducts all the law business of the County and is the legal advisor ... for the Council"; and that he is required to represent the County "in all legal action in which the County is a party." [3] SABEL and the private defendants rely on *State v. Burning Tree Club,* 301 Md. 9, 481 A.2d 785 (1984) to support their argument that a County Attorney may not maintain a suit which challenges the validity of a charter provision. In *Burning Tree,* the Attorney General of Maryland instituted a declaratory judgment action challenging the constitutionality of a state statute. We determined that the Attorney General, who brought the suit in his official capacity, lacked standing to challenge the

---

**3.** Section 402(c) of the charter authorizes the Council to obtain outside legal counsel when the problems are of an "extraordinary nature when the work to be done is of a character or magnitude requiring services in addition to those regularly provided by the Office of Law." The Council engaged private counsel to represent it in this case.

statute as he was under no duty to administer it and therefore was not placed in the "dilemma" of administering an unconstitutional statute. 301 Md. at 25, 481 A.2d 785. We also held that the Attorney General had no common law powers to challenge state statutes even when such action was in the public interest, and that the Attorney General "ordinarily" has a duty to defend a state statute's validity. *Id.* at 34, 36, 481 A.2d 785.

A home rule county charter is a local constitution, *Ritchmount Partnership v. Board*, 283 Md. 48, 388 A.2d 523 (1978), and the role of the County Attorney is therefore somewhat analogous to that of the Attorney General. However, *Burning Tree* is not applicable in this case because Slay has brought this action, not in his official capacity, but as an individual citizen and taxpayer. The circuit court so found, concluding that Slay's status as County Attorney (a part-time position) "would not work a forfeiture of his voting and citizenship rights." We agree with the circuit court that, in the circumstances of this case, Slay's rights as a citizen and taxpayer are not negated by his position as County Attorney.

SABEL and the private defendants argue in the alternative that even if Slay is acting in his individual, rather than official capacity, he has not shown sufficient damage to maintain taxpayer standing. Slay asserted in the complaint that the expenditure of public funds to place the invalid and void initiative on the ballot could result in increased taxes or other pecuniary loss to him. Slay's claim is almost identical to that of the taxpayer-plaintiff in *Sun Cab Co. v. Cloud*, 162 Md. 419, 159 A. 922 (1932). In that case, the plaintiff alleged that the proposed referendum was void because many of the signatures on the petition were forged or invalid. He claimed standing to sue based on the fact that he and other taxpayers would be "put to wrongful expense for the publication of the referendum and the printing of it on the ballots of the next general election." *Id.* at 422, 159 A. 922. In finding the requisite

taxpayer standing, we said, at 426–27, 159 A. 922, that "according to the settled practice, taxpayers interested in avoiding the waste of funds derived from taxation which would be involved in conducting [a] void referendum may make application to the court for the remedy." Other of our cases hold that the taxpayer need not allege facts which necessarily demonstrate that taxes will be increased; rather the test is whether the taxpayer reasonably may sustain a pecuniary loss or a tax increase, *i.e.*, whether there has been a showing of potential pecuniary damage. *See State v. Burning Tree Club, Inc.*, 315 Md. 254, 292, 554 A.2d 366 (1989); *Inlet Associates v. Assateaque House*, 313 Md. 413, 441, 545 A.2d 1296 (1988); *Citizens P. & H. Ass'n v. County Exec.*, 273 Md. 333, 338–343, 329 A.2d 681 (1974). The amount of the potential pecuniary loss is irrelevant. *Citizens, supra*, 273 Md. at 344, 329 A.2d 681.

■ The damages alleged by Slay in this case are essentially the same as those alleged in *Sun Cab Co.* Therefore, we hold that Slay has satisfied the taxpayer-standing test by showing a potential pecuniary loss if the initiative was placed on the November 8, 1988 ballot. Because Slay has standing as a taxpayer, and the case could proceed with Slay as the only plaintiff, we need not determine whether the County also has standing to bring the suit. *See Montgomery County v. Board of Elections*, 311 Md. 512, 516, n. 3, 536 A.2d 641 (1988), a case involving two proposed charter amendments where a taxpayer sought a declaratory judgment that the amendments were invalid and an injunction prohibiting placement of the proposals on the ballot. There, the lower court had ruled that the County Executive, also a plaintiff, lacked standing to sue; we declined to consider the issue because the taxpayer's standing by itself was sufficient. To the same effect, *see State's Atty v. City of Balto.*, 274 Md. 597, 602, 337 A.2d 92 (1975).

SABEL and the private defendants also assert that they are the "wrong defendants," *i.e.*, that there is no "actual controversy" between them and the plaintiffs. The private defendants contend that they have no interest in upholding

and no legal duty to defend the constitutionality of § 216. Similarly, SABEL maintains with reliance upon *Harford County v. Schultz, supra,* that it "has no interest one way or the other in the outcome of this proceeding." 280 Md. at 85, 371 A.2d 428. Both argue, in essence, that the requirements of § 3–409 of the Courts Article as to justiciability have not been satisfied and that the case must be dismissed.

■ It is clear that a defendant in a declaratory judgment action must possess the

"... right, authority, or power to place the plaintiff's rights in jeopardy. In other words, the opposition to the plaintiff's demand must be by some one named a defendant who is legally competent to place the plaintiff's rights in jeopardy."

1 W. Anderson, *Actions for Declaratory Judgments* 58 (1951). The private defendants, in exercising their purported rights under § 216 of the County Charter, have placed the plaintiffs' interests in jeopardy, for their actions challenge the Council's role as the primary legislative body in Talbot County. The private defendants qualify under § 3–409(a)(3) as adversary parties who have a "concrete interest" in the rights afforded to them under § 216. Their activities in this regard threaten the legal status and/or rights of the Council and Slay as a taxpayer. The private defendants are not, therefore, uninterested in championing the constitutionality of § 216, for they have asserted rights afforded to them under that section to initiate legislation. There is no requirement in the Declaratory Judgments Act that the private defendants have a legal duty to defend the case, or that for purposes of determining justiciability, no injunctive or other affirmative relief was prayed against them (the prayer for injunction being directed only against the local board and SABEL which controlled the local election machinery).

■ The private defendants have presented a spirited defense of the constitutionality of § 216, and state and local elections boards are ordinarily named as co-defendants in

similar cases. *See, e.g., Montgomery County v. Board of Elections, supra; Sun Cab Co. v. Cloud, supra.* The election boards are necessary parties because the relief sought is an injunction against placement of the initiative on the Talbot County ballot. *See Givner v. Cohen,* 208 Md. 23, 116 A.2d 357 (1955) (necessary parties are those who have or claim an interest which would be affected by the declaration); Code § 3–405(a) of the Courts Article.

Since standing to sue is satisfied in this case, and an actual controversy exists between adversarial parties, we now turn to the merits of the case.

### III.

Article XI–A was ratified by the voters of Maryland in 1915. Its purpose was to "share with the counties and Baltimore City, within well-defined limits, powers formerly reserved to the General Assembly so as to afford the subdivisions certain powers of self-government." *Cheeks v. Cedlair Corp.,* 287 Md. 595, 597, 415 A.2d 255 (1980).

Section 1 of Article XI–A provides for the election of a charter board to prepare a "charter or form of government for ... such County." The charter, if approved by a majority of voters, becomes the law of the county, "subject only to the Constitution and Public General Laws, of [Maryland]." Section 2 directs the General Assembly to "provide a grant of express powers for such County," which "shall not be enlarged or extended by any charter formed under the provisions of this Article, but such powers may be extended, modified, amended or repealed by the General Assembly." [4]

Section 3 requires that each home rule county charter "provide for an elective legislative body in which shall be vested the law-making power of said ... County." It provides that the legislative body in a home rule county is

----

**4.** *See* The Express Powers Act, Maryland Code (1957, 1987 Repl.Vol.), Art. 25A, § 5.

to be referred to as the County Council. It states that subject to the Constitution and Public General Laws of the State, the Council "shall have full power to enact local laws of said City or County including the power to repeal or amend local laws of said City or County enacted by the General Assembly, upon all matters covered by the express powers granted as above provided."

Section 4 states that, once a county adopts a home rule charter, "no public local law shall be enacted by the General Assembly for said ... County on any subject covered by the express powers granted as above provided." Section 5 discusses amendments to the charter; it authorizes their proposal by the County Council or by the citizens upon a petition signed by at least twenty percent of the registered voters of the county. Upon approval by a majority of voters, the amendment becomes part of the charter.

Section 6 provides for the transfer of the General Assembly's power over local authorities to the voters of each county. It states:

"... that said powers so transferred shall be exercised only by the adoption or amendment of a charter as hereinbefore provided; and provided further that this Article shall not be construed to authorize the exercise of any powers in excess of those conferred by the Legislature upon said Counties or City as this Article sets forth."

The Talbot County Charter, adopted in 1973, provides in § 202:

"All powers which may be exercised by Talbot County under the Constitution and laws of Maryland, including all law-making powers heretofore exercised by the General Assembly of Maryland but transferred to the people of the County by adoption of this Charter, are vested in the Council subject to those powers retained by the people of Talbot County as hereinafter set forth in Sections 216 and 217 of the Charter. The County Council is responsible for the enforcement of this Charter and the laws passed under its terms, which responsibility may be delegated

and the officials and employees so charged shall have the authority conferred upon them by the laws of Talbot County."

Section 217 of the charter describes the referendum procedure, by which certain laws passed by the County Council may be approved or disapproved by county voters at a general election. And as previously noted, § 216 authorizes direct voter-initiated legislation. *See supra* n. 1.

The Council and Slay argue that § 216 of the charter undermines the Council's role as the "primary" legislative body in Talbot County, in that it conflicts with § 3 of Article XI–A; and that it violates §§ 2 and 6 of Article XI–A by enlarging and extending the powers granted to the counties and by authorizing "the exercise of powers in excess of those conferred by the [General Assembly]." *See Ritchmount Partnership v. Board, supra; Cheeks v. Cedlair Corp., supra. See also Griffith v. Wakefield*, 298 Md. 381, 470 A.2d 345 (1984).

■ In ruling upon the constitutionality of a charter provision, we consider the rule:

"... that there is always a presumption in favor of the constitutionality of a legislative enactment. When the Court is called upon to review an act of the Legislature, a co-ordinate branch of the government, its duty is of the gravest character. The Court will not denounce a statute as void on the ground that the lawmaking power has violated the Constitution, except when such violation is clear and unmistakable. Consequently the Court will always so construe a statute as to avoid a conflict with the Constitution and give it full force and effect whenever reasonably possible."

*Kirkwood v. Provident Savings Bank*, 205 Md. 48, 59, 106 A.2d 103, 109 (1953). In *Wilson v. Bd. of Sup. of Elections*, 273 Md. 296, 300–01, 328 A.2d 305, 308 (1974), we applied these rules to charter amendments. Therefore, if more than one construction of § 216 is possible, we must adopt the construction that avoids conflict with the Mary-

land Constitution. *Id.* at 301, 328 A.2d 305. If, however, only one interpretation is reasonably possible, and that interpretation conflicts with a constitutional provision, we must declare the charter provision invalid.

## IV.

In *Ritchmount Partnership v. Board,* 283 Md. 48, 388 A.2d 523 (1978), we were called upon to decide "whether the people of a home rule county may confer upon themselves the power of referendum over local legislative enactments, where such power was neither delegated by act of the General Assembly nor expressly reserved to the inhabitants of charter counties by the Constitution of this State." *Id.* at 50-51, 388 A.2d 523. We found that Article XI-A was intended to provide for two categories of home rule powers: (1) the power to form and establish local government (which is implicitly granted under § 1 of Article XI-A) and (2) the power to enact local law (which is dependent on an express grant of powers from the General Assembly). We noted that the referendum power "directly affects the distribution of political power between the people of Anne Arundel County and their elected legislative representative body, the County Council, and thus is a fundamental feature of the overall structure of county government." *Id.* at 61, 388 A.2d 523. We said that it creates:

"... what is in effect a coordinate legislative entity, ... [which] is as much an element of the local political decision-making apparatus as the County Executive or the County Council itself. As such, referendum by petition is quite clearly a power affecting the form or structure of local government and therefore belongs to that class of powers vested directly in the people of the several counties by Article XI-A, § 1. *Id.*"

We also held in *Ritchmount* that the referendum power does not conflict with § 3 of Article XI-A. We observed that § 3, which vests the law-making power of the county in the County Council, simply renders that body

"... the ultimate repository of all legislative power possessed by the county and not expressly reserved to some other body, such as the electorate. Section 3 undoubtedly requires that the council be the primary legislative organ; it does not altogether preclude the existence of other entities with coordinate legislative powers."

*Id.* at 63, 388 A.2d 523. We decided, in the context of the referendum power, that the declaration in § 3 that the County Council "shall have full power to enact local law" was not meant to imply exclusivity. Rather, the phrase "full power" describes the quality of that power. "In other words, with respect to the powers delegated to it, the County Council is to have as ample and complete power to legislate over local affairs as the General Assembly possessed prior to the ratification of Article XI–A and the enactment of the Express Powers Act." *Id.*

The private defendants rely on *Ritchmount,* claiming that the power of direct legislative initiative, like the referendum power, is a part of the form and structure of government, and that § 216 simply provides for a "coordinate legislative entity." [5] They also contend that the initiative power under § 216 does not violate § 3 of Article XI–A because this power was directly reserved to the electorate in § 202 of the County Charter, and because it does not interfere with the Council's role as the County's "primary legislative organ."

■  While the power of direct legislative initiative, where authorized, may constitute a part of the form and structure of government, home rule county charters in Maryland under § 1 of Art. XI–A are always subject to the Constitution and public general laws of the State. We hold that § 216 of the County Charter is manifestly repugnant to § 3 of Article XI–A. In *Cheeks v. Cedlair Corp., supra,* we explained:

---

5.  SABEL has taken no position on the constitutionality of § 216, and appealed only as to the justiciability issue.

"The powers of referendum and initiative, though each may affect the form or structure of local government, are otherwise distinctly different. Under the referendum power, the elective legislative body, consistent with § 3, continues to be the primary legislative organ, for it has formulated and approved the legislative enactment referred to the people. The exercise of the legislative initiative power, however, completely circumvents the legislative body, thereby totally undermining its status as the primary legislative organ."

*Id.* [287 Md.] at 613, 415 A.2d 255. Thus, we held that "the power to initiate legislation, unlike the referendum power, cannot be reconciled with § 3." *Id.* To the same effect, *see Rowe v. Chesapeake & Potomac Tel. Co.*, 56 Md.App. 23, 34, 466 A.2d 538 (1983) (holding that there is no right of legislative initiative in Maryland home rule jurisdictions, that right being constitutionally limited to charter amendments involving actual charter material amending the form or structure of government).

Although *Cheeks* involved an attempt by Baltimore City voters to initiate legislation by charter amendment, its principles apply equally to legislation by direct initiative. Indeed, direct legislative initiative is constitutionally at odds with the primacy of the elected legislative body. While it may be true, for example, that a citizen-initiated law could be repealed by the County Council, the repealing enactment itself could be abrogated through the referendum process, thereby rendering nugatory the constitutional authority of the Council as the primary legislative organ.

In view of our holding that § 216 is constitutionally invalid under § 3 of Article XI-A, we need not consider whether the charter provision also conflicts with §§ 2 and 6 of Article XI-A.

Maryland Rule 1-341 provides, in a civil action, that "if the court finds that the conduct of any party in maintaining or defending any proceeding was in bad faith or without substantial justification," it may award costs of the proceed-

ing and expenses, including reasonable attorney's fees, incurred by the adverse party in opposing the action.

The private defendants invoked this rule in the circuit court, claiming that the plaintiffs sued them "without substantial justification." They contended that the Council should have defended the validity of § 216 of the charter, as well as the initiative proposed pursuant to it, rather than challenging them in court and thereby thrusting upon the private defendant citizens of Talbot County the expense associated with defending the case.

In denying the motion of the private defendants under Rule 1–341, the circuit court found that, without regard to the County's standing to bring the action, Slay had standing to bring the suit. It concluded that our 1980 holding in *Cheeks* was adequate justification for the plaintiffs' belief that § 216 was unconstitutional and that, consequently, "it would be a waste of time and taxpayers' money to hold an invalid election."

The trial judge found, and we agree, that the constitutionality of § 216 of the charter presented an issue "requiring resolution." Rather than discontinuing their opposition to the plaintiffs' action after their motion for summary judgment was denied, the private defendants vigorously contested the plaintiffs' position that § 216 was unconstitutional, requiring that the proposed initiative be enjoined. Their action assured a judicial resolution of this important public question through the adversarial process and thereby constituted a distinct benefit to the County and its citizens. Nevertheless, under the provisions of Rule 1–341, we cannot conclude that the trial judge erred in determining that the plaintiffs' suit against the private defendants was not brought without substantial justification. We must, therefore, affirm that part of the trial court's judgment which denied a Rule 1–341 award to the private defendants.

As earlier indicated, we have heretofore filed our mandate in this case affirming that part of the judgment of the circuit court declaring § 216 of the Talbot County Charter

unconstitutional and enjoining the placement of the Detention Center Initiative on the November 8, 1988 General Election ballot. It thus remains only for us to affirm that part of the judgment denying the private defendants' claim for an award of attorney's fees, expenses, and costs incurred in the circuit court.

AS TO THAT PART OF THE JUDGMENT OF THE CIRCUIT COURT FOR TALBOT COUNTY RELATING TO PAYMENT OF ATTORNEY FEES, EXPENSES AND COSTS IN THE TRIAL COURT: JUDGMENT AFFIRMED.

COSTS ON APPEAL TO BE ALLOCATED UNDER MARYLAND RULE 8–607 AS FOLLOWS: MARYLAND STATE ADMINISTRATIVE BOARD OF ELECTION LAWS TO PAY OWN COSTS; COUNTY COUNCIL OF TALBOT COUNTY AND JAMES M. SLAY TO PAY ALL OTHER COSTS AS INCLUDED IN THIS COURT'S MANDATE.

MANDATE TO ISSUE FORTHWITH.

COLE, Judge, dissenting:

I dissent for reasons set forth in my dissenting opinion in *Cheeks v. Cedlair Corp.*, 287 Md. 595, 632, 415 A.2d 255 (1980).